T.C. Memo. 2011-25

UNITED STATES TAX COURT

RALPHS GROCERY CO. & SUBSIDIARIES f.k.a. RALPHS SUPERMARKETS, INC., & SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent

FRED MEYER, INC., & SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 20364-06, 25969-06.    Filed January 27, 2011.

Roger J. Jones, Andrew R. Roberson, and Sarah S. Sandusky, for petitioners.

Alan M. Jacobson, John E. Budde, and Laurie A. Nasky, for respondent.

## MEMORANDUM OPINION

CHIECHI, Judge: These cases are before us on the motion for partial summary judgment of petitioners (petitioners' motion) and the motion for partial summary judgment of respondent (respondent's motion). We shall grant petitioners' motion, and we shall deny respondent's motion.

### Background

The parties are in agreement regarding or do not dispute the following facts.[1]

At the time petitioner Ralphs Grocery Co. (RGC) and its subsidiaries filed the petition in the case at docket No. 20364-06, all of RGC's stores and its main warehouse were located, and all goods and services were provided, exclusively in California.

At the time petitioner Fred Meyer, Inc. (Fred Meyer), and its subsidiaries filed the petition in the case at docket No.

_____

[1]The parties filed with the Court a stipulation of facts together with stipulated exhibits attached and an agreed statement of material facts that are to control for purposes of their respective motions for partial summary judgment. (We shall refer to that stipulation together with those exhibits and that agreed statement as the parties' agreed facts.) The parties' agreed facts pertain to, inter alia, the requirements and effects of the U.S. Bankruptcy Code (Bankruptcy Code), 11 U.S.C. (2006). Respondent objected to several stipulated exhibits. We shall not rule on respondent's evidentiary objections. That is because we need not rely on the exhibits to which respondent objects in order to resolve the questions presented in the parties' respective motions for partial summary judgment.

25969-06, Fred Meyer had its headquarters in Oregon and provided goods and services primarily in Oregon and Washington.

At the time petitioners filed their respective petitions, RGC and Fred Meyer were subsidiaries of the Kroger Co. (Kroger) and were members of Kroger's consolidated group for Federal income tax (tax) purposes. At that time, Kroger had its headquarters in Ohio.

In 1873, George A. Ralphs founded a grocery store business in Los Angeles, California (Ralphs grocery store business). That business remained privately owned for over 90 years. In 1968, Federated Department Stores, Inc. (Federated), purchased the Ralphs grocery store business from its then owners. Federated operated that business as an unincorporated division of Federated until 1988.

In 1986, Campeau Corp. (Campeau), a corporation organized under the laws of Canada, acquired Allied Stores Corp. (Allied) for approximately $3.6 billion. At that time, Allied operated certain retail department stores through certain of its subsidiaries.

In 1988, Campeau acquired Federated for approximately $6.7 billion. At that time, in addition to operating the Ralphs grocery store business, Federated operated certain retail department stores through certain of its subsidiaries. Campeau's acquisition of Federated constituted a qualified stock purchase

under section 338(d)(3).[2]  In connection with its acquisition of Federated, pursuant to section 1.338-4T(f)(6), Temporary Income Tax Regs., 50 Fed. Reg. 16413 (Apr. 25, 1985), Campeau made a protective carryover basis election and an offset prohibition election.

In order to finance Campeau's acquisitions of Allied and Federated,[3] certain subsidiaries of Campeau borrowed funds from Citibank, Bank of Montreal, Banque Paribas (Paribas), the Edward J. DeBartolo Corp. (EJDC), and Olympia & York CC Limited (O&Y).

On June 6, 1988, Ralphs Acquisition Co. was incorporated under the laws of Delaware.  Around that date, Federated trans- ferred all of the assets and the liabilities of the Ralphs grocery store business to a transitory subsidiary (Newco) in exchange for all of the common stock of Newco.  Thereafter, Newco merged with and into Ralphs Acquisition Co., which changed its name to Ralphs Grocery Co. (Ralphs).[4]  As part of that merger,

---

[2]All section references are to the Internal Revenue Code (Code) in effect at all relevant times.

[3]The parties agree that certain subsidiaries of Campeau borrowed funds in order to finance Campeau's acquisitions of Allied and Federated.  However, the parties' agreed facts do not refer to any amounts that Campeau or any of its subsidiaries borrowed with respect to the acquisition of Allied.

[4]Ralphs Grocery Co. that we shall refer to as Ralphs is not the same entity as petitioner Ralphs Grocery Co.  As discussed below, in June 1995 Ralphs was merged into Ralphs Supermarkets, Inc. (RSI).  Thereafter, RSI, the surviving company, assumed the name Ralphs Grocery Co.

Federated transferred to Ralphs all of the common stock of Newco in exchange for a promissory note of Ralphs in the amount of $900 million. (We shall refer to the series of transactions by which Federated transferred the Ralphs grocery store business to Newco and Ralphs in exchange for a $900 million promissory note as the Ralphs incorporation transaction.) For tax purposes, the Ralphs incorporation transaction was treated in part as an intercompany asset sale and in part as a dividend distribution of the Ralphs grocery store business. The Ralphs incorporation transaction resulted in a deferred intercompany gain (Ralphs deferred inter-company gain) in excess of $500 million. At an undisclosed date after the Ralphs incorporation transaction, all of the outstanding common stock of Ralphs[5] was transferred to Allied and Holdings III, Inc. (Holdings III), an indirect subsidiary of Campeau that had been incorporated in 1988.

Campeau organized its operations in the United States through Federated Stores, Inc. (FSI), a holding company formerly

---

[5]In August 1988, Ralphs issued to certain executives and certain key employees of Ralphs 170,000 shares of nonvoting series A preferred stock (series A nonvoting preferred stock) and 130,000 shares of nonvoting series B preferred stock (series B nonvoting preferred stock) for an aggregate price of $3 million. A portion of the series A nonvoting preferred stock was required to be redeemed each year beginning in 1992 and continuing through 1998. A portion of the series B nonvoting preferred stock was required to be redeemed each year beginning in 1992 and continuing through 1996. In addition, Ralphs was permitted to redeem at any time the series A nonvoting preferred stock and the series B nonvoting preferred stock provided that it gave the owners of that respective stock five days notice of any such redemption.

known as Campeau Corp. (U.S.), Inc.  FSI was the parent corpora-
tion of a consolidated group (FSI consolidated group) for tax
purposes that consisted of approximately 60 other U.S. corpora-
tions, including Allied, Federated, and Ralphs, that filed a
single consolidated tax return for each of the taxable years
ended January 31, 1989 through 1993, and that had an ownership
structure as of October 28, 1991, as described below.[6]  Certain
members of the FSI consolidated group were engaged in the real
estate business, certain other members were engaged in the retail
department store business, and Ralphs was engaged in the grocery
store business.

As of October 28, 1991, FSI owned:  (1) 100 percent of the
outstanding common stock of Holdings III, (2) 100 percent of the
outstanding common stock of Campeau Properties, Inc. (CPI), and
(3) 100 percent of the outstanding common stock of each of
certain corporations (FSI shopping center corporations) that each
owned certain shopping centers.[7]

As of October 28, 1991, CPI, which had been incorporated in
1988 and was serving as a holding company for FSI's ownership

---

[6]Attached as an appendix is a chart showing the ownership
structure as of Oct. 28, 1991, of the members of the FSI consoli-
dated group.

[7]Each of the FSI shopping center corporations held a 50-
percent interest in certain partnerships.  EJDC owned directly or
indirectly the remaining 50-percent interest in each of those
partnerships.

interests in certain shopping mall developments that FSI, EJDC, and their respective affiliates were to develop jointly, owned 7.5 percent of the outstanding common stock of Federated Holdings, Inc. (Holdings).

As of October 28, 1991, Holdings III owned: (1) 100 percent of the outstanding common stock of Federated Holdings II, Inc. (Holdings II), (2) approximately 83.75 percent[8] of the outstanding common stock of Ralphs, (3) a promissory note due from Federated (Federated note) in the principal amount of $75 million, and (4) a promissory note due from Allied (Allied note) in the principal amount of $100 million.

As of October 28, 1991, Holdings II, which had been incorporated in 1990, owned: (1) 100 percent of the outstanding common stock of Allied,[9] (2) 28.04 percent of the outstanding common stock of Holdings, and (3) a residual interest in certain collateral relating to a certain monetization agreement.

As of October 28, 1991, Allied owned: (1) 50 percent of the outstanding common stock of Holdings, (2) approximately 16.25

---

[8]In the parties' agreed facts, the parties agreed to the approximate percentage of the outstanding common stock of Ralphs that Holdings III owned. For convenience, we shall not refer hereinafter to that ownership percentage as approximate.

[9]As of Oct. 28, 1991, Allied also had outstanding certain preferred stock that was publicly traded.

percent[10] of the outstanding common stock of Ralphs, and (3) 100 percent of the stock of each of certain operating subsidiaries that were engaged in the retail department store business.

As of October 28, 1991, certain investors unrelated to the members of the FSI consolidated group owned 6.96 percent of the outstanding common stock of Holdings. As of that date, EJDC owned 7.5 percent of the outstanding common stock of Holdings. On December 12, 1991, EJDC sold that stock of Holdings to FSI for $1. After that sale, EJDC was not a stockholder of any member of the FSI consolidated group.

As of October 28, 1991, Holdings, which had been incorporated in 1988, owned: (1) 100 percent of the outstanding common stock of Federated and (2) the residual interest in a $1 million escrow fund.

As of October 28, 1991, Federated owned 100 percent of the stock of each of certain operating subsidiaries that were engaged in the retail department store business.

Certain members of the FSI consolidated group borrowed funds from certain financial institutions in order to finance Campeau's acquisition of Federated (discussed above). In May 1988, Bank of Montreal and Paribas lent $500 million to FSI in order to finance

_____

[10]In the parties' agreed facts, the parties agreed to the approximate percentage of the outstanding common stock of Ralphs that Allied owned. For convenience, we shall not refer hereinafter to that ownership percentage as approximate.

Campeau's acquisition of Federated.  In April 1989, FSI prepaid that loan in full.  FSI made that payment by using a $500 million dividend that Holdings III had paid to FSI around that time.  Around April 1989, before paying that dividend, Holdings III received a $500 million dividend from Holdings II.  Around the same time, Holdings II had raised the $500 million that it used to pay that dividend by selling to Allied for $500 million (1) approximately 36.2 percent of the outstanding common stock of Holdings and (2) an option to purchase an additional 1 percent of the outstanding common stock of Holdings.

In May 1988, EJDC lent $480 million to FSI (EJDC equity loan) to finance Campeau's acquisition of Federated.  That loan was evidenced by a promissory note in the amount of $480 million (FSI $480 million note) that FSI issued to EJDC.[11]  In connection with the EJDC equity loan, EJDC, Campeau, FSI, and CPI executed a document entitled "MASTER PLEDGE AGREEMENT" (EJDC master pledge agreement).

In April 1989, FSI and EJDC refinanced the EJDC equity loan and renegotiated its terms.  Pursuant to that refinancing, EJDC returned to FSI the FSI $480 million note in exchange for a new promissory note from FSI in the amount of $480 million (FSI new

---

[11]EJDC also received in consideration for the EJDC equity loan (1) 7.5 percent of the outstanding common stock of Holdings, which it owned as of Oct. 28, 1991, and (2) a pledge of the outstanding common stock of Holdings that CPI owned (i.e., 7.5 percent of the outstanding common stock of Holdings).

$480 million note).[12]  Campeau guaranteed FSI's payment of all sums due under the FSI new $480 million note.

In connection with the refinancing of the EJDC equity loan, EJDC, Campeau, FSI, Holdings III, CPI, and the FSI shopping center corporations executed a document entitled "MASTER PLEDGE AGREEMENT" (EJDC revised master pledge agreement) that superseded the EJDC master pledge agreement.  Under that revised pledge agreement, certain members of the FSI consolidated group pledged to EJDC the following properties as security for FSI's perfor- mance under the FSI new $480 million note:  (1) 100 percent of the outstanding common stock of CPI that FSI owned, (2) certain partnership interests and certain stock that CPI owned, including the common stock of Holdings that CPI owned, (3) the stock that FSI owned in each of the FSI shopping center corporations and the respective partnership interests that each of those corporations owned, (4) 100 percent of the outstanding common stock of Allied,[13] and (5) the 83.75 percent of the outstanding common stock of Ralphs that Holdings III owned.  The EJDC revised master

---

[12]EJDC retained the pledge consisting of the 7.5 percent of the outstanding common stock of Holdings that CPI owned and that EJDC had received as consideration for the EJDC equity loan.  See supra note 11.

[13]In April 1989, FSI owned directly 100 percent of the outstanding common stock of Allied.  As of Oct. 28, 1991, Hold- ings II owned 100 percent of the outstanding common stock of Allied.  The parties' agreed facts do not establish how or when Holdings II acquired that stock.

pledge agreement provided that EJDC was to release on May 1, 1991, the pledge by Holdings III of the 83.75 percent of the outstanding stock of Ralphs that Holdings III owned. EJDC did not release that pledge on May 1, 1991.

Each of the pledges under the EJDC revised master pledge agreement was subordinate to (1) FSI's payment of all sums due under the FSI new $480 million note and (2) Campeau's guaranty of FSI's payment of those sums. The EJDC revised master pledge agreement did not state that any pledge of property under that agreement had priority over any other pledge of property under that agreement.

On April 7, 1989, Citibank, Bank of Montreal, and Paribas provided to Allied certain revolving working capital in the amount of $280 million. On the same date, Bank of Montreal and Paribas provided to Allied a certain revolving inventory facility in the amount of $70 million.

On September 12, 1989, O&Y agreed to lend up to $250 million to Campeau. Thereafter, Campeau borrowed $175 million of that $250 million from O&Y (Campeau $175 million loan). Campeau then lent $175 million to FSI that was evidenced by a note from FSI in the amount of $175 million (FSI $175 million note). Thereafter, FSI lent $175 million to Holdings III that was evidenced by a note from Holdings III in the amount of $175 million (Holdings III note). The Holdings III note was payable no later than

September 12, 1991, and provided for an interest rate of 9.875 percent per year.

Holdings III used the $175 million that it borrowed from FSI to lend $100 million to Allied and $75 million to Federated that were evidenced by the Allied note and the Federated note, respectively.

On September 18, 1989, Holdings III guaranteed the Campeau $175 million loan that Campeau received from O&Y around September 12, 1989.  On September 18, 1989, Holdings III also pledged to O&Y as security for that guaranty the outstanding common stock of Ralphs that Holdings III owned (i.e., 83.75 percent).  That pledge was subject to the security interest of EJDC in that stock under the EJDC revised master pledge agreement.

In late 1989, certain members of the FSI consolidated group became aware that they would be unable to make payments timely with respect to the debt that each had incurred.  As a result, between January 14 and March 30, 1990, FSI and certain of its subsidiaries, including Holdings, Holdings II, and Holdings III, filed in the U.S. Bankruptcy Court for the Northern District of California (California U.S. Bankruptcy Court) respective voluntary petitions for relief (chapter 11 petitions) under chapter 11, entitled "Reorganization", of the Bankruptcy Code, 11 U.S.C. secs. 1101-1174. (We shall refer collectively to FSI and certain of its subsidiaries that filed chapter 11 petitions in the

California U.S. Bankruptcy Court as the FSI debtors.)  At the time Holdings III filed its chapter 11 petition in the California U.S. Bankruptcy Court, the Holdings III note was the only evidence of indebtedness of Holdings III for money that it had borrowed.

In the chapter 11 petition that it filed with the California U.S. Bankruptcy Court, Holdings III reported total assets of $1,004,285,000 and total liabilities of $657,778,000.  In the consolidated balance sheets for each of the taxable years ended January 31, 1991 through 1993, the FSI consolidated group reported, based on book value, the following total assets and total liabilities (not including stockholders equity) of Holdings III as of the beginning of each of those taxable years:

| Date | Total Assets | Total Liabilities |
|------|-------------|-------------------|
| Feb. 1, 1990 | $179,754,880 | $179,754,879 |
| Feb. 1, 1991 | 180,457,073 | 179,754,880 |
| Feb. 1, 1992 | 180,293,905 | 179,775,064 |

On January 15, 1990, Allied and certain of its subsidiaries (collectively, Allied debtors) and Federated and certain of its subsidiaries (collectively, Federated debtors) filed in the U.S. Bankruptcy Court for the Southern District of Ohio (Ohio U.S. Bankruptcy Court) chapter 11 petitions under chapter 11 of the Bankruptcy Code.  (We shall refer collectively to the Allied debtors and the Federated debtors as the Allied/ Federated debtors.)  On January 15, 1990, the Ohio U.S. Bank-

ruptcy Court consolidated the respective chapter 11 cases of the Allied debtors and the Federated debtors for joint administration under a single docket number.  (We shall refer to the proceedings commenced in the Ohio U.S. Bankruptcy Court that that court consolidated on January 15, 1990, as the Allied chapter 11 proceedings.)

In the chapter 11 petition that it filed with the Ohio U.S. Bankruptcy Court, Allied reported, based on book value, total assets of approximately $2,934,000,000 and total liabilities of approximately $2,406,000,000 as of October 28, 1989.  In the chapter 11 petition that it filed with the Ohio U.S. Bankruptcy Court, Federated reported, based on book value, total assets of approximately $6,202,000,000 and total liabilities of approximately $5,339,000,000 as of October 28, 1989.

On July 2, 1990, the California U.S. Bankruptcy Court transferred venue in the respective chapter 11 cases of the FSI debtors to the Ohio U.S. Bankruptcy Court.  On July 13, 1990, the Ohio U.S. Bankruptcy Court consolidated those proceedings for joint administration under a single docket number.  (We shall refer to the proceedings commenced in the California U.S. Bankruptcy Court that the Ohio U.S. Bankruptcy Court consolidated on July 13, 1990, as the FSI chapter 11 proceedings.)  Thereafter, the Ohio U.S. Bankruptcy Court considered and treated the Allied

chapter 11 proceedings and the FSI chapter 11 proceedings as interrelated and closely coordinated those proceedings.

Around early 1990, Ralphs was solvent. At no time did Ralphs file a petition under the Bankruptcy Code. Nor was Ralphs a debtor in either the FSI chapter 11 proceedings or the Allied chapter 11 proceedings. As a result, no creditor claims were filed against Ralphs in the FSI chapter 11 proceedings or in the Allied chapter 11 proceedings.

The FSI consolidated group filed Form 1120, U.S. Corporation Income Tax Return (Form 1120), for its taxable year ended January 31, 1991 (FSI consolidated group 1/31/91 consolidated return). The FSI consolidated group attached to that return a consolidated balance sheet in which it reported, based on book value, the following total assets and total liabilities (not including stockholders equity) as of the beginning of that taxable year (i.e., February 1, 1990) of that group and of certain of its members:

| Company/Group | Total Assets[1] | Total Liabilities |
|---|---|---|
| FSI consolidated group | $12,022,633,639 | $13,975,652,352 |
| FSI | 836,271,594 | 1,008,207,723 |
| Holdings III | 179,754,880 | 179,754,879 |
| Holdings II | 476,483,273 | 477,014,279 |
| Holdings | -0- | 30,540 |
| Federated | 6,572,255,075 | 6,879,178,500 |
| Allied | 3,020,041,662 | 3,846,033,370 |
| Ralphs | 1,404,826,686 | 1,369,630,102 |

[1]The term "Total Assets" does not include any amount representing the value of intangible assets. In the consolidated balance sheet that the FSI consolidated group attached to the FSI consolidated group 1/31/91 consolidated return, line 13A, "INTANGIBLE ASSETS", was left blank for each member of that consolidated group.

For the FSI consolidated group's taxable year ended January 31, 1990, Holdings claimed a worthless stock deduction with respect to the common stock of Federated that it owned. For that taxable year, Allied, Holdings II, and CPI each claimed a worthless stock deduction with respect to the common stock of Holdings that each owned.

At all times during the FSI chapter 11 proceedings, the FSI debtors, including FSI and Holdings III, operated as debtors in possession under the Bankruptcy Code and conducted their respective ongoing businesses substantially as they had conducted those businesses before the FSI chapter 11 proceedings had commenced. During the pendency of the FSI chapter 11 proceedings through early February 1992, FSI and the other FSI debtors continued to be managed by the officers that had managed the respective FSI

debtors before the FSI chapter 11 proceedings had commenced.[14] At no time during the FSI chapter 11 proceedings did the Ohio U.S. Bankruptcy Court appoint any trustee to take control of the assets and the business of any of the FSI debtors. Nor did that court appoint any examiner for any of those debtors. At no time during the FSI chapter 11 proceedings did any creditor of FSI object to FSI's acting as a debtor in possession. Nor did any of those creditors ask the Ohio U.S. Bankruptcy Court to appoint any trustee.

At all times during the Allied chapter 11 proceedings, the Allied/Federated debtors also operated as debtors in possession and conducted their respective ongoing businesses substantially as they had conducted those businesses before the Allied chapter 11 proceedings had commenced.[15]

---

[14]From January 1990 to February 1992, G. William Miller served as the chairman and the chief executive officer of FSI.

[15]The parties' agreed facts do not indicate whether during the pendency of the Allied chapter 11 proceedings through early February 1992 the Allied/Federated debtors continued to be managed by the officers that had managed the respective Allied/ Federated debtors before the Allied chapter 11 proceedings had commenced. Nor do those agreed facts indicate whether certain facts (discussed below) that the parties agree apply to the FSI debtors and/or the FSI chapter 11 proceedings also apply to the Allied/Federated debtors and/or the Allied chapter 11 proceedings. However, neither party argues that any such fact does not apply to the Allied/Federated debtors and/or the Allied chapter 11 proceedings. We assume that is because in making their respective arguments with respect to their respective motions for partial summary judgment the parties focus their arguments on the receipt of certain RHC stock by certain creditors of FSI and do

(continued...)

The U.S. Trustee Program (U.S. trustee program), a component of the U.S. Department of Justice that is responsible for promoting the efficiency and protecting the integrity of the Federal bankruptcy system, oversaw the FSI chapter 11 proceedings and the Allied chapter 11 proceedings. Pursuant to that program, six official creditor committees were appointed in the Allied chapter 11 proceedings. Pursuant to the U.S. trustee program, an official committee of unsecured creditors of FSI was appointed in the FSI chapter 11 proceedings.[16] None of EJDC, Bank of Montreal, Paribas, O&Y, or Campeau was a member of the committee of unsecured creditors of FSI appointed pursuant to the U.S. trustee program in the FSI chapter 11 proceedings.

Several claims were filed in the FSI chapter 11 proceedings against the various FSI debtors, including the following claims. EJDC filed numerous claims in the FSI chapter 11 proceedings, including: (1) Certain secured claims against FSI, identified as class 1, under the EJDC revised master pledge agreement and the FSI new $480 million note; (2) certain secured claims against Holdings II, identified as class 2, under a certain agreement;

---

[15](...continued)
not focus on the receipt of certain RHC stock by certain creditors of Allied. See infra note 49.

[16]Each of the respective official committees appointed pursuant to the U.S. trustee program in the Allied chapter 11 proceedings and the official committee of unsecured creditors appointed pursuant to that program in the FSI chapter 11 proceedings possessed certain rights under the Bankruptcy Code.

(3) certain secured claims against Holdings III, identified as class 3, under the EJDC revised master pledge agreement and any pledge agreement regarding the Allied note or the Federated note; (4) certain secured claims against CPI, identified as class 4; (5) certain respective unsecured claims against FSI, Holdings III, and CPI, identified as class 14, including any unsecured deficiency claims[17] against those debtors; and (6) certain unsecured claims against any of the FSI debtors, identified as class 15, to the extent such claims were not included in class 14.[18] EJDC's claims against the FSI debtors, except Holdings, totaled approximately $480 million, not including interest due on those claims.

In the FSI chapter 11 proceedings, EJDC asserted a lien on the following property of certain of the FSI debtors: (1) The common stock of CPI that FSI owned; (2) the common stock of each of the FSI shopping center corporations that FSI owned; (3) FSI's interest in the Holdings III note; (4) the common stock of Ralphs that Holdings III owned; (5) the common stock of Holdings that

---

[17]An "unsecured deficiency claim" was any portion of a claim to the extent that the value of the claimholder's interest in the applicable FSI debtor's interest in any property securing the claim was less than the amount of the claim or to the extent that the amount of any claim subject to setoff was less than the amount of such claim, as determined under sec. 506(a) of the Bankruptcy Code.

[18]Each of the debts on which the creditor claims of EJDC against the FSI debtors was based had been guaranteed by Campeau.

CPI owned; (6) a certain general partnership interest that CPI owned in a certain partnership; (7) the 50-percent partnership interest of each of the FSI shopping center corporations in the partnerships that operated certain shopping malls jointly with EJDC; and (8) the common stock of Allied that Holdings II owned.

There were several potential grounds on which the FSI debtors might have been able to invalidate the security interest that EJDC claimed in the common stock of Ralphs that Holdings III owned. The FSI debtors claimed in certain documents filed with the Ohio U.S. Bankruptcy Court that if they were not able to invalidate the security interests in the property of certain of the FSI debtors that EJDC asserted, EJDC would be entitled to (1) all of the value attributable to the common stock of Ralphs that Holdings III owned, which the FSI debtors estimated to equal approximately $485.8 million, and (2) all of the value attributable to the common stock of each of the FSI shopping center corporations that FSI owned, which FSI estimated to be not more than $80 million, to the extent necessary to satisfy EJDC's oversecured claims totaling approximately $543 million.

Bank of Montreal and Paribas filed certain unsecured claims against the FSI debtors, identified as class 20, relating to the $500 million that they had lent to FSI in May 1988. Bank of Montreal and Paribas filed those claims as a protective measure in the event FSI recovered as a "voidable preference" under the

Bankruptcy Code a portion of the $500 million that it had repaid to Bank of Montreal and Paribas in April 1989.

O&Y filed a secured claim against Holdings III, identified as class 8, under the terms of the Allied note and the Federated note and under Holdings III's guaranty of the loan that O&Y had agreed on September 12, 1989, to make available to Campeau. O&Y filed an unsecured deficiency claim against Holdings III and all other FSI debtors, identified as class 21. O&Y also asserted as security for its claims against Holdings III a lien on the common stock of Ralphs that Holdings III owned.

FSI filed a secured claim against Holdings III, identified as class 10, under the Holdings III note. FSI also filed an unsecured claim against Holdings III, identified as class 24, that included any unsecured deficiency claim.

Campeau filed a secured claim against FSI, identified as class 9, under the FSI $175 million note. Campeau filed an unsecured claim against the FSI debtors, identified as class 22, that included any unsecured deficiency claims and any claims Campeau may have assigned to O&Y as security. Campeau also asserted a lien on the claims that FSI filed and that were identified as class 10 and class 24.

Ralphs filed an unsecured claim against the FSI debtors, identified as class 26, under certain tax-sharing agreements that certain members of the FSI consolidated group, including Ralphs,

had entered into before the FSI chapter 11 proceedings had been commenced.

Holdings III held the interest, identified as class 39, in the outstanding common stock of Holdings II. FSI held the interest, identified as class 40, in the outstanding common stock of Holdings III.

In addition to the claims discussed above, Allied had potential claims against the FSI debtors for fraudulent conveyance, breach of fiduciary duties, indemnity, and civil conspiracy. Those claims were asserted on behalf of Allied against the FSI debtors with respect to the funds that FSI used in April 1989 to repay to Bank of Montreal and Paribas the $500 million that those companies lent to FSI in May 1988. FSI had potential claims for preference against Bank of Montreal and Paribas with respect to the claims asserted on Allied's behalf against the FSI debtors. Bank of Montreal and Paribas had contingent claims to recover from FSI any amount which Bank of Montreal or Paribas would be required to pay Allied or by which their other claims against Allied might be reduced as a result of Allied's claims against the FSI debtors with respect to the $500 million that Bank of Montreal and Paribas had lent to FSI. Bank of Montreal and Paribas asserted that their respective claims would be senior to those claims of EJDC that were secured by the common stock of Ralphs that Holdings III owned.

Several claims were filed in the Allied chapter 11 proceedings against the various Allied/Federated debtors, including the following claims. Bank of Montreal and Paribas filed secured and unsecured claims against Allied, identified as class A-6, class AR-6, and class AO-6, with respect to the respective revolving working capital and revolving inventory facilities that they had extended to Allied on April 7, 1989.

Holdings III filed an unsecured claim against Allied, identified as class A-17, under the Allied note. Holdings III also filed an unsecured claim against Federated, identified as class F-10, under the Federated note.

EJDC and its affiliates filed more than 200 claims against the Allied/Federated debtors. EJDC asserted that its claims against Federated were secured by a pledge of the Federated note and the Allied note.

Holdings held the interest, identified as class F-15, in the outstanding common stock of Federated. Holdings II held the interest, identified as class F-19, in the outstanding common stock of Allied.

The FSI debtors and the Allied/Federated debtors had obligations under the Bankruptcy Code to file with the Ohio U.S. Bankruptcy Court in the FSI chapter 11 proceedings and the Allied chapter 11 proceedings respective proposed plans of reorganiza-

tion[19] and respective disclosure statements with respect to those proposed plans of reorganization.  Under the Bankruptcy Code, the FSI debtors and the Allied/Federated debtors had an exclusive right during the 120 days following the date on which those debtors filed their respective chapter 11 petitions (plan exclusivity period) to file respective proposed plans of reorganization with the Ohio U.S. Bankruptcy Court.  On several occasions, the FSI debtors and the Allied/Federated debtors requested extensions of their respective plan exclusivity periods.  The Ohio U.S. Bankruptcy Court granted each of those requests.

At no time did EJDC, Bank of Montreal, Paribas, O&Y, or Campeau seek to reduce the time during which FSI had the exclusive right to file a proposed plan of reorganization with the Ohio U.S. Bankruptcy Court.  Nor did those creditors object to the requests of FSI to extend the time during which it had the exclusive right to file a proposed plan of reorganization with that court.[20]

---

[19]The term "plan of reorganization" is used herein to refer to a plan described in ch. 11 of the Bankruptcy Code, 11 U.S.C. secs. 1101-1174.  Our use of that term is not intended to refer to a plan of reorganization for tax purposes or to imply that any proposed plan of reorganization filed with the Ohio U.S. Bankruptcy Court constituted a plan of reorganization for tax purposes.

[20]The docket sheet of the Ohio U.S. Bankruptcy Court in the FSI chapter 11 proceedings did not reflect (1) that EJDC, Bank of Montreal, Paribas, O&Y, or Campeau requested that that court shorten the FSI debtors' plan exclusivity period in the FSI

(continued...)

During the FSI chapter 11 proceedings and the Allied chapter 11 proceedings, the FSI debtors, the Allied debtors, the Federated debtors, Ralphs, the various creditors committees, and other respective creditors of the FSI debtors and the Allied/Federated debtors engaged in extensive discussions and negotiations regarding the resolution of the FSI chapter 11 proceedings and the Allied chapter 11 proceedings.  Each of the participants in those discussions and negotiations was represented by separate professional advisors.

The FSI debtors and the Allied/Federated debtors filed with the Ohio U.S. Bankruptcy Court respective joint proposed plans of reorganization in the FSI chapter 11 proceedings and the Allied chapter 11 proceedings.  Thereafter, those debtors amended on several occasions the respective joint proposed plans and filed with the Ohio U.S. Bankruptcy Court those respective amended joint proposed plans.  None of EJDC, Bank of Montreal, Paribas, O&Y, or Campeau objected to the confirmation of any of the respective proposed plans of reorganization that the FSI debtors and the Allied/Federated debtors filed with the Ohio U.S. Bank-

---

[20](...continued)
chapter 11 proceedings or (2) that any of those creditors objected to the several requests that the FSI debtors made to the Ohio U.S. Bankruptcy Court for extensions of that plan exclusivity period.

ruptcy Court.[21] No party except the FSI debtors and the Allied/Federated debtors filed with that court a proposed plan of reorganization in the FSI chapter 11 proceedings or the Allied chapter 11 proceedings.

On October 28, 1991, the FSI debtors filed with the Ohio U.S. Bankruptcy Court in the FSI chapter 11 proceedings (1) a document entitled "Third Amended Joint Plan of Reorganization for Federated Stores, Inc.; Federated Holdings, Inc.; Federated Holdings II, Inc.; Federated Holdings III, Inc. and Campeau Properties, Inc." (October 1991 proposed FSI chapter 11 plan) and (2) a document entitled "Second Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for Federated Stores, Inc.; Federated Holdings, Inc.; Federated Holdings II, Inc.; Federated Holdings III, Inc. and Campeau Properties, Inc." (FSI disclosure statement).[22]

On October 28, 1991, the Allied/Federated debtors filed with the Ohio U.S. Bankruptcy Court in the Allied chapter 11 proceedings (1) a document entitled "Third Amended Joint Plan of Reorga-

---

[21]The docket sheet of the Ohio U.S. Bankruptcy Court in the FSI chapter 11 proceedings did not reflect that EJDC, Bank of Montreal, Paribas, O&Y, or Campeau filed any document with that Court objecting to the confirmation of any of the respective proposed joint plans of reorganization that the FSI debtors filed with that Court in those proceedings.

[22]The docket sheet of the Ohio U.S. Bankruptcy Court in the FSI chapter 11 proceedings did not reflect that EJDC, Bank of Montreal, Paribas, O&Y, or Campeau filed any document with that Court objecting to the adequacy of the FSI disclosure statement.

nization of Federated Department Stores, Inc., Allied Stores Corporation and Certain of Their Subsidiaries" (October 1991 proposed Allied chapter 11 plan) and (2) a document entitled "Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Third Amended Joint Plan of Reorganization for Federated Department Stores, Inc., Allied Stores Corporation, and Certain of Their Subsidiaries" (Allied disclosure statement).

The October 1991 proposed FSI chapter 11 plan and the October 1991 proposed Allied chapter 11 plan (collectively, the October 1991 proposed chapter 11 plans) were interdependent. The effectiveness of the October 1991 proposed FSI chapter 11 plan was conditioned on the satisfaction of or, if waivable, waiver of all of the conditions to the effectiveness of the October 1991 proposed Allied chapter 11 plan.

According to the FSI debtors and the Allied/Federated debtors, the primary reason for filing separate proposed plans of reorganization in their respective chapter 11 proceedings was the existence of separate debt structures for the respective opera- tions of the FSI debtors and the Allied/Federated debtors. Other reasons of the FSI debtors and the Allied/Federated debtors for filing separate proposed plans of reorganization were: (1) Allied, Federated, and Ralphs were separate reporting compa- nies under certain Federal securities laws; (2) the agreement of the respective parties to the FSI chapter 11 proceedings and the

Allied chapter 11 proceedings that the creditors of the retail department store businesses should become equity participants in those businesses after the chapter 11 reorganization; and (3) the retail department store businesses and the Ralphs grocery store business had little in common, having been operated separately under separate management and from separate geographic locations.

According to the FSI disclosure statement, the overall purposes of the October 1991 proposed FSI chapter 11 plan were: (1) To distribute the assets of the FSI debtors among the creditors of those debtors; (2) to maximize the amount that the creditors of the FSI debtors could recover on their respective claims against those debtors and to allocate that amount in a manner that the FSI debtors viewed as fair and reasonable; and (3) to settle and compromise certain significant disputes that the FSI debtors believed would result in significant expense if litigated and that had the potential to impact adversely the FSI debtors if determined adversely to them.

According to the Allied disclosure statement, the overall purposes of the October 1991 proposed Allied chapter 11 plan were: (1) To alter the respective debt and the respective capital structures of the Allied/Federated debtors so that at the conclusion of the Allied chapter 11 proceedings those debtors would possess viable respective capital structures; (2) to maximize the amount that the creditors of the Allied/Federated

debtors could recover on their respective claims against those debtors and to allocate that amount in a manner that the Allied/ Federated debtors viewed as fair and reasonable; and (3) to settle, compromise, or otherwise dispose of certain claims of and against the Allied/Federated debtors on terms that those debtors believed to be reasonable. In addition, Allied/Federated debtors intended for the October 1991 proposed Allied chapter 11 plan to preserve certain economies of scale and other benefits of the joint operation of the Allied/Federated debtors.

As a specific condition to any confirmation by the Ohio U.S. Bankruptcy Court of the October 1991 proposed chapter 11 plans, the FSI debtors, the Allied/Federated debtors, and the respective creditors of those debtors entered into an agreement (comprehensive settlement agreement) that was to resolve certain actual and potential claims that those parties had against each other under terms that those parties determined were reasonable. That agreement provided, inter alia, that the parties to that agreement generally agreed to use their best efforts to have the Ohio U.S. Bankruptcy Court confirm the October 1991 proposed chapter 11 plans.

Under the comprehensive settlement agreement, the FSI debtors, the Allied/Federated debtors, Ralphs, and some of the respective creditors of those debtors were to execute releases regarding potential and actual claims among and between the

parties to that agreement. Those claims included the various respective claims of EJDC, Bank of Montreal, Paribas, O&Y, and Campeau. Many of the issues raised by the claims that the parties to the comprehensive settlement agreement were to release were novel or unresolved issues of law that could have required time-consuming litigation to resolve.

Under the comprehensive settlement agreement, certain tax-sharing agreements between and among members of the FSI consolidated group that had been entered into before the commencement of the FSI chapter 11 proceedings and the Allied chapter 11 proceedings were to be canceled as a condition to the execution of the comprehensive settlement agreement and of the Ohio U.S. Bankruptcy Court's confirmation of the October 1991 proposed chapter 11 plans.[23]

Under the comprehensive settlement agreement, the claim of Holdings III with respect to the Federated note was to be reduced from $77.1 million to $40.7 million in order to account for certain claims that the Federated debtors had against FSI with

---

[23]One of the tax-sharing agreements was between Ralphs and FSI. Under that agreement, for each taxable year of the FSI consolidated group Ralphs was obligated to pay to FSI an amount equal to the amount of tax that Ralphs would have paid if Ralphs had filed a separate tax return for that taxable year. In return, each member of the FSI consolidated group agreed to indemnify jointly and severally and hold harmless Ralphs against any claim of liability for tax of the FSI consolidated group.

respect to certain tax-sharing agreements among those debtors and FSI.

The comprehensive settlement agreement stated that that agreement was an essential element of and means of implementation of the October 1991 proposed chapter 11 plans. That agreement also stated that each of the October 1991 proposed chapter 11 plans was an essential element of and means of execution of the comprehensive settlement agreement.

The October 1991 proposed chapter 11 plans proposed to separate the ownership and the operation of the Ralphs grocery store business from the respective ownership and the respective operations of the real estate businesses and the retail department store businesses. In order to achieve that separation, the October 1991 proposed chapter 11 plans proposed, inter alia, that Allied and Federated merge into a single surviving entity, known as New Federated, thereby consolidating the real estate businesses and the retail department store businesses, and that a majority of the outstanding common stock of Ralphs be distributed to EJDC, Bank of Montreal, and Paribas, all of which were unrelated to the FSI consolidated group.

In negotiating the terms of the October 1991 proposed FSI chapter 11 plan, FSI proposed to value all of the outstanding common stock of Ralphs at $580 million solely for the purpose of allocating the outstanding common stock of Ralphs which Holdings

III owned and which the FSI debtors proposed in that plan that Holdings III transfer to EJDC, Bank of Montreal, Paribas, and Campeau.[24]  Although FSI had proposed a value higher than $580 million for the outstanding common stock of Ralphs, FSI was willing to, and did, propose a value of $580 million for that stock in order to achieve a consensus among the parties that negotiated the terms of the October 1991 proposed FSI chapter 11 plan.  Based on a value of $580 million for all of the outstanding common stock of Ralphs, the Allied/Federated debtors assumed that the value of the outstanding common stock of Ralphs that Allied owned (i.e., 16.25 percent) was approximately $94 million.

The FSI debtors proposed in the October 1991 proposed FSI chapter 11 plan that EJDC receive the following with respect to its creditor claims identified as classes 1, 2, 3, 4, 14, and 15: (1) 20 million shares of the outstanding common stock of Ralphs, representing approximately 60.34 percent of the total outstanding common stock of Ralphs, to be distributed from the shares of Ralphs common stock that Holdings III owned; (2) a release under the comprehensive settlement agreement of any claims against EJDC; and (3) certain respective real estate partnership inter-

---

[24]The net value of all of the outstanding common stock of Ralphs was at least $475 million.

ests that the FSI shopping center corporations owned or certain stock of those corporations that FSI owned.[25]

The FSI debtors proposed in the October 1991 proposed FSI chapter 11 plan that Bank of Montreal and Paribas, in consideration for (1) their respective creditor claims identified as class 20, (2) their respective agreements under the comprehensive settlement agreement to release any claims against EJDC, and (3) their respective consents to the October 1991 proposed Allied chapter 11 plan as holders of the claims identified as class A-6, receive the following: (1) 3,514,286 shares of the outstanding common stock of Ralphs, representing approximately 10.6 percent of the total outstanding common stock of Ralphs, to be distributed equally between Bank of Montreal and Paribas and to be distributed from the shares of Ralphs common stock that Holdings III owned and (2) releases under the comprehensive settlement agreement of any potential claims against Bank of Montreal or Paribas.

The FSI debtors proposed in the October 1991 proposed FSI chapter 11 plan that Campeau receive the following with respect

---

[25]Under the October 1991 proposed FSI chapter 11 plan, it was proposed that EJDC receive the respective real estate partnership interests that each of the FSI shopping center corporations owned, unless FSI determined that any such distribution to EJDC would have adverse tax consequences to FSI. In that event, under the October 1991 proposed FSI chapter 11 plan, it was proposed that EJDC receive certain respective stock of the FSI shopping center corporations that FSI owned.

to its creditor claims against FSI identified as classes 9 and 22: (1) 4,244,241 shares of the outstanding common stock of Ralphs, representing approximately 12.8 percent of the total outstanding common stock of Ralphs, to be distributed from the shares of Ralphs common stock that Holdings III owned, (2) cash, and (3) a release under the comprehensive settlement agreement of any potential claims against it. Under the October 1991 proposed FSI chapter 11 plan, the FSI debtors proposed that a portion (i.e., 0.8 percent) of the outstanding common stock of Ralphs that those debtors proposed be distributed to Campeau be distributed to FSI and be sold by FSI as needed in order to satisfy certain obligations and expenses arising under the October 1991 proposed FSI chapter 11 plan. To the extent that FSI did not sell any portion of the Ralphs stock that it received, the FSI debtors proposed in the October 1991 proposed FSI chapter 11 plan that FSI distribute that portion to Campeau.

The FSI debtors proposed in the October 1991 proposed FSI chapter 11 plan that O&Y receive the following with respect to its creditor claims identified as classes 8 and 21: (1) A distribution from Campeau with respect to Holdings III's guaranty of the loan that O&Y agreed on September 12, 1989, to make available to Campeau and (2) a release under the comprehensive settlement agreement of any potential claims against it.

The FSI debtors proposed in the October 1991 proposed FSI chapter 11 plan that FSI receive with respect to its creditor claims identified as classes 10 and 24 the property of the estate of Holdings III, if any, after the distribution pursuant to that proposed plan of the common stock of Ralphs that Holdings III owned. In the October 1991 proposed FSI chapter 11 plan the FSI debtors proposed that FSI distribute pursuant to that plan any such property that it received.

The FSI debtors proposed in the October 1991 proposed FSI chapter 11 plan that the respective creditor claims of EJDC, Bank of Montreal, Paribas, O&Y, and Campeau all be impaired. In that proposed plan the FSI debtors proposed that all secured claims except the secured claims identified as class 11[26] be impaired. In the October 1991 proposed FSI chapter 11 plan the FSI debtors proposed that several creditors that had filed respective unsecured claims against the FSI debtors receive certain distributions with respect to their claims.

The FSI debtors proposed in the October 1991 proposed FSI chapter 11 plan that Holdings, Holdings II, Holdings III, and CPI be dissolved and that their respective assets vest in and be held by FSI as disbursing agent for distribution under the October

[26]The claims identified as class 11 consisted of claims against Holdings II under a certain loan agreement dated Apr. 29, 1988, pursuant to which Holdings II borrowed certain funds from Citicorp Investment Bank Ltd.

1991 proposed FSI chapter 11 plan.  In that proposed plan the FSI debtors proposed that FSI continue in existence until the October 1991 proposed FSI chapter 11 plan had been fully consummated and the Ohio U.S. Bankruptcy Court closed the FSI chapter 11 proceedings.  At that time FSI would dissolve.

The FSI debtors proposed in the October 1991 proposed FSI chapter 11 plan that all of the outstanding common stock of Holdings III be canceled upon the dissolution of that company and that no property be distributed to FSI with respect to its interest, identified as class 40, as the sole stockholder of Holdings III.

In summary, the FSI debtors proposed in the October 1991 proposed FSI chapter 11 plan that Holdings III transfer to the following creditors of FSI the following approximate percentages of the outstanding common stock of Ralphs:

| FSI Creditor | Percentage of Outstanding Common Stock of Ralphs |
|---|---|
| EJDC | 60.4 |
| Campeau | 12.8 |
| Bank of Montreal | 5.3 |
| Paribas | 5.3 |

The Allied/Federated debtors proposed in the October 1991 proposed Allied chapter 11 plan that on or after the effective date of that proposed plan Allied and Federated merge and that all of their respective assets vest in a single surviving company, to be known as New Federated.  The Allied/Federated debtors

proposed in that proposed plan that all of the outstanding common stock of New Federated be distributed to the respective creditors of the Allied debtors and the Federated debtors.

The Allied/Federated debtors proposed in the October 1991 proposed Allied chapter 11 plan that Holdings III receive with respect to its claim against Federated under the Federated note 816,000 shares of the common stock of New Federated. The Allied/Federated debtors proposed in that proposed plan that 588,000 of those 816,000 shares be distributed pursuant to the October 1991 proposed FSI chapter 11 plan to the respective general, unsecured creditors of FSI and Holdings III in satisfaction of those unsecured creditors' respective claims against FSI and Holdings III. The Allied/Federated debtors proposed in the October 1991 proposed Allied chapter 11 plan that the remaining 228,000 shares of the common stock of New Federated that that plan proposed Holdings III receive be sold under the October 1991 proposed FSI chapter 11 plan to provide cash to FSI. In the October 1991 proposed Allied chapter 11 plan the Allied/Federated debtors proposed that Holdings III contribute to the capital of Allied its claim against Allied under the Allied note and that no property be distributed to Holdings III with respect to that claim.

The Allied/Federated debtors proposed in the October 1991 proposed Allied chapter 11 plan that Bank of Montreal and Paribas

each receive with respect to their respective claims identified as classes A-6, AR-6, and AO-6 approximately 4.83 percent of the total outstanding common stock of Ralphs, to be distributed from the shares of Ralphs common stock that Allied owned and that New Federated[27] was to own pursuant to the October 1991 proposed Allied chapter 11 plan.

The Allied/Federated debtors proposed in the October 1991 proposed Allied chapter 11 plan that Allied retain in its capacity as a stockholder of Ralphs the shares of the Ralphs common stock that it owned and that were not to be distributed to Bank of Montreal and Paribas (i.e., 6.6 percent of the outstanding common stock of Ralphs). New Federated, as the successor to Allied, was to retain and continue to own such stock.

In summary, the Allied/Federated debtors proposed in the October 1991 proposed Allied chapter 11 plan that the following companies own the following approximate percentages of the outstanding common stock of Ralphs after any distributions of that stock proposed in that proposed plan:

---

[27]As discussed above, the Allied/Federated debtors proposed in the October 1991 proposed Allied chapter 11 plan that Allied and Federated merge into a single surviving entity known as New Federated.

| Entity | Percentage of Outstanding Common Stock of Ralphs |
|---|---|
| Bank of Montreal | 4.8 |
| Paribas | 4.8 |
| New Federated | 6.6 |

As of February 3, 1991, an appraisal estimated that, excluding the then-outstanding debt of Ralphs of approximately $985 million and the cash and cash equivalents of $34.7 million that Ralph owned, the value of Ralphs was between approximately $1.45 billion and $1.55 billion.

The FSI debtors, the Allied/Federated debtors, Ralphs, the creditors that filed claims in the FSI chapter 11 proceedings and/or the Allied chapter 11 proceedings, and their respective representatives negotiated the terms of an indemnification agreement. They believed that such an indemnification agreement would be necessary in order to allocate among the members of the FSI consolidated group responsibility for certain liabilities, including certain tax liabilities. That was because of, inter alia, the pendency of the FSI chapter 11 proceedings and the Allied chapter 11 proceedings, the proposed cancellation of certain tax-sharing agreements among the members of the FSI consolidated group, the separation proposed in the October 1991 proposed chapter 11 plans of the retail department store businesses and the Ralphs grocery store business into entities with

separate ownership, and the fact that the FSI consolidated group was at all relevant times filing a single consolidated tax return.

In October 1991, the FSI debtors, the Allied/Federated debtors, Ralphs, and the creditors that filed claims in the FSI chapter 11 proceedings and/or the Allied chapter 11 proceedings filed with the Ohio U.S. Bankruptcy Court an unexecuted proposed indemnification agreement (October 1991 proposed indemnification agreement) that they had negotiated and that they proposed be effective as of the effective date of the October 1991 proposed FSI chapter 11 plan. The Ohio U.S. Bankruptcy Court did not approve the October 1991 proposed indemnification agreement.

It was proposed in the October 1991 proposed indemnification agreement, inter alia, that responsibility for certain nontax liabilities arising from the conduct of the respective businesses of the parties to that agreement be allocated among those parties and that certain tax liabilities be allocated among certain of those parties. Certain proposals were made in the October 1991 proposed indemnification agreement to address certain other matters regarding the relationship of the parties to that agreement after certain of those parties ceased to be members of the FSI consolidated group.

It was also proposed in the October 1991 proposed indemnification agreement that New Federated, FSI, and Ralphs indemnify

one another and certain other members of the FSI consolidated group for certain losses relating to, resulting from, or arising out of the conduct of their respective businesses before, on, or after the effective date of the October 1991 proposed FSI chapter 11 plan.

It was further proposed in the October 1991 proposed indemnification agreement that New Federated indemnify and hold harmless Ralphs, Holdings III, FSI, and certain subsidiaries of FSI from and against certain tax liabilities that became known after the respective effective dates of the October 1991 proposed FSI chapter 11 plan and the October 1991 proposed Allied chapter 11 plan but that were attributable to taxable years that ended on or before those effective dates.  In exchange for that proposed indemnification, it was proposed in the October 1991 proposed indemnification agreement that Ralphs pay to New Federated (1) $10 million over a period of five years beginning on the effective date of the October 1991 proposed FSI chapter 11 plan and (2) an amount equal to 21 percent of any taxes for which New Federated indemnified Ralphs but not to exceed $15 million, adjusted by a certain $5 million credit potentially available to Ralphs.

After the FSI debtors and the Allied/Federated debtors filed the October 1991 proposed FSI chapter 11 plan and the October 1991 proposed Allied chapter 11 plan, respectively, the FSI

debtors, the Allied/Federated debtors, Ralphs, and the respective creditors that had filed claims in the FSI chapter 11 proceedings and/or the Allied chapter 11 proceedings discussed and negotiated certain modifications of the terms of those proposed chapter 11 plans. Under the respective modified proposed FSI chapter 11 plan and the modified proposed Allied chapter 11 plan, the FSI debtors and the Allied/Federated debtors proposed (1) the incorporation of a new company, Ralphs Holding Co., Inc. (RHC), (2) the transfer to it by Holdings III and Allied of their respective common stock ownership in Ralphs (i.e., 83.75 percent and 16.25 percent, respectively), (3) the transfer to Holdings III and Allied by RHC of 83.75 percent and 16.25 percent, respectively, of RHC's outstanding common stock, (4) the respective distributions by Holdings III to certain of FSI's creditors and by Allied to certain of its creditors of their respective shares of outstanding common stock of RHC in the same amounts and in the same manner as the parties to the October 1991 proposed chapter 11 plans had proposed in those proposed plans Holdings III and Allied distribute the common stock of Ralphs. (We shall refer to the series of transactions that the FSI debtors and the Allied/ Federated debtors proposed in the modifications to the October 1991 proposed chapter 11 plans (namely, that RHC be incorporated, Holdings III and Allied transfer their respective common stock of Ralphs to RHC, RHC transfer all of its common stock to Holdings

III and Allied, and Holdings III and Allied distribute their respective common stock of RHC) as the Ralphs transaction.)

The proposed Ralphs transaction required the parties that negotiated the terms of the October 1991 proposed indemnification agreement to revise the terms of that agreement to take into account that proposed transaction.  Around late 1991, Federated and certain of its subsidiaries, Allied and certain of its subsidiaries, New Federated (as the proposed successor to Allied and Federated), FSI and certain of its subsidiaries, Holdings III, Ralphs, and RHC executed a document entitled "INDEMNIFICA-TION AGREEMENT" (proposed final indemnification agreement).[28]  It was proposed in the proposed final indemnification agreement that that agreement be effective as of the effective date of the proposed FSI chapter 11 plan that the Ohio U.S. Bankruptcy Court confirmed.  The execution of the proposed final indemnification agreement was necessary in order to induce the parties to that proposed agreement to approve any proposed chapter 11 plans in the respective chapter 11 proceedings.  However, any such indem-nification agreement would have been necessary to induce such approvals regardless of whether the Ralphs transaction had been

---

[28]No stipulated exhibit referred to the proposed final indemnification agreement as being part of the consideration for any transaction that occurred with respect to the FSI chapter 11 proceedings or the Allied chapter 11 proceedings.

proposed as a modification to the respective October 1991 proposed chapter 11 plans.

It was also proposed in the proposed final indemnification agreement that Holdings III be indemnified against any deficiency in tax attributable to the Ralphs transaction, including any tax attributable to an election under section 338(h)(10).

It was further proposed in the proposed final indemnification agreement that RHC become a joint and several co-obligor with respect to payments that the proposed initial indemnification agreement proposed be made by Ralphs. As a result, in the proposed final indemnification agreement it was proposed that Ralphs and RHC be jointly and severally liable for payments to New Federated of not less than $10 million and not more than $20 million.

On January 8, 1992, the FSI debtors filed with the Ohio U.S. Bankruptcy Court in the FSI chapter 11 proceedings a document entitled "Additional Modification (Effective Upon Filing Pursuant to Bankruptcy Code Section 1127) of Third Amended Plan of Reorganization for Federated Stores, Inc.; Federated Holdings, Inc.; Federated Holdings II, Inc.; Federated Holdings III, Inc.; and Campeau Properties, Inc." (January 1992 proposed FSI chapter 11 plan). Around that date, the Allied/Federated debtors filed with the Ohio U.S. Bankruptcy Court in the Allied chapter 11 proceedings a modification of the October 1991 proposed Allied chapter

11 plan (January 1992 proposed Allied chapter 11 plan).  Certain

revisions and modifications of certain provisions of the October

1991 proposed FSI chapter 11 plan were proposed in the January

1992 proposed FSI chapter 11 plan in order to include the Ralphs

transaction, which included the contemplated creation of RHC.

The January 1992 proposed FSI chapter 11 plan proposed to include

the following paragraph with respect to the contemplated creation

of RHC:

> 5.   Creation of Ralphs Holding Company
>
> Prior to the Effective Date, Holdings III and
> Allied may, at their election (with the concurrence of
> each party who will receive Ralphs Common Stock under
> the [October 1991 proposed FSI bankruptcy] Plan),
> contribute all of the common stock of Ralphs owned by
> those entities to a newly incorporated Delaware corpo-
> ration which may be formed for the purpose of holding
> all of the issued and outstanding capital stock of
> Ralphs (the "Ralphs Holding Company").  In exchange for
> contributing their respective holdings of common stock
> of Ralphs to Ralphs Holding Company, Holdings III will
> receive that number of shares of capital stock in
> Ralphs Holding Company so that it owns the same per-
> centage of the issued and outstanding capital stock of
> Ralphs Holding Company as of the Effective Date as it
> now owns of the common stock of Ralphs, and Allied will
> receive that number of shares of capital stock in
> Ralphs Holding Company so that it owns the same per-
> centage of the issued and outstanding capital stock of
> Ralphs Holding Company as of the Effective Date as it
> now owns of the common stock of Ralphs.

Certain provisions were proposed in the January 1992 pro-

posed FSI chapter 11 plan that differed from the provisions

proposed in the October 1991 proposed FSI chapter 11 plan,

including the following.  The FSI debtors proposed in the January

1992 proposed FSI chapter 11 plan that EJDC receive the following with respect to its creditor claims identified as classes 1, 2, 3, 4, 14, and 15: (1) 20 million shares of the common stock of RHC, representing approximately 60.34 percent of the total outstanding common stock of RHC, to be distributed from the shares of the outstanding common stock of RHC that Holdings III was to own; (2) a release under the comprehensive settlement agreement of any claims against EJDC; and (3) certain respective real estate partnership interests that the FSI shopping center corporations owned or certain stock of those corporations that FSI owned.[29]

The FSI debtors proposed in the January 1992 proposed FSI chapter 11 plan that Bank of Montreal and Paribas, in consideration for (1) their respective creditor claims identified as class 20, (2) their respective agreements under the comprehensive settlement agreement to release any claims against EJDC, and (3) their respective consents to the January 1992 proposed Allied chapter 11 plan as holders of the claims identified as class A-6, receive the following: (1) 3,514,286 shares of the outstanding common stock of RHC, representing approximately 10.6 percent of the total outstanding common stock of RHC, to be distributed equally between Bank of Montreal and Paribas and to be distributed from the shares of RHC common stock that Holdings III was to

---

[29]See supra note 25.

own and (2) releases under the comprehensive settlement agreement of any potential claims against Bank of Montreal or Paribas.

The FSI debtors proposed in the January 1992 proposed FSI chapter 11 plan that Campeau receive the following with respect to its creditor claims against FSI identified as classes 9 and 22: (1) 4,244,241 shares of the outstanding common stock of RHC, representing approximately 12.8 percent of the total outstanding common stock of RHC, to be distributed from the shares of RHC common stock that Holdings III was to own, (2) cash, and (3) a release under the comprehensive settlement agreement of any potential claims against it. Under the January 1992 proposed FSI chapter 11 plan the FSI debtors proposed that a portion (i.e., 0.8 percent) of the outstanding common stock of RHC that those debtors proposed be distributed to Campeau be distributed to FSI and be sold by FSI as needed in order to satisfy certain obligations and expenses arising under the January 1992 proposed FSI chapter 11 plan. To the extent that FSI did not sell any portion of the RHC stock that it received, the FSI debtors proposed in the January 1992 proposed FSI chapter 11 plan that FSI distribute that portion to Campeau.

The FSI debtors proposed in the January 1992 proposed FSI chapter 11 plan that FSI receive with respect to its creditor claims identified as classes 10 and 24 any property of the estate of Holdings III after the distribution pursuant to that proposed

plan of the common stock of RHC that Holdings III was to own.  In the January 1992 proposed FSI chapter 11 plan the FSI debtors proposed that FSI distribute pursuant to that plan any such property it received.

The FSI debtors proposed in the January 1992 proposed FSI chapter 11 plan that the respective creditor claims of EJDC, Bank of Montreal, Paribas, O&Y, and Campeau all be impaired.  In that proposed plan, the FSI debtors proposed that all secured claims except the secured claims identified as class 11[30] be impaired. In the January 1992 proposed FSI chapter 11 plan the FSI debtors proposed that several creditors that had filed respective unsecured claims against the FSI debtors receive certain distributions with respect to their claims.

The FSI debtors proposed in the January 1992 proposed FSI chapter 11 plan that all of the outstanding common stock of Holdings III be canceled upon the dissolution of that company and that no property be distributed to FSI with respect to its interest, identified as class 40, as the sole stockholder of Holdings III.

In summary, the FSI debtors proposed in the January 1992 proposed FSI chapter 11 plan that Holdings III transfer to the following creditors of FSI the following approximate percentages of the outstanding common stock of RHC:

---

[30]See supra note 26.

|                    | Percentage of Outstanding |
|--------------------|---------------------------|
| FSI Creditor       | Common Stock of RHC       |
| EJDC               | 60.4                      |
| Campeau            | 12.8                      |
| Bank of Montreal   | 5.3                       |
| Paribas            | 5.3                       |

The FSI debtors proposed, inter alia, in the January 1992 proposed FSI chapter 11 plan the following provision:

H. **Nondischarge And Injunction**.

1. **Nondischarge Of Debtors**.

Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order shall not discharge claims against any of the [FSI] Debtors. However, no creditor of any of said Debtors may receive any payment from, or seek recourse against, any assets which are to be distributed under Sections IV, V, and VI of this Plan, except for those distributions expressly provided for in said Sections IV, V, and VI. As of the Confirmation Date, all entities are precluded from asserting, against any property which is to be distributed under Section IV, V or VI of this Plan, any claims, obligations, rights, causes of action, liabilities or equity interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, other than as expressly provided in this Plan or the Confirmation Order, whether or not (a) a proof of claim or proof of interest based on such debt or interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a claim or interest based on such debt or interest is allowed pursuant to section 502 of the Bankruptcy Code or (c) the holder of a claim or interest based on such debt or interest has accepted the Plan.

2. **Injunction**.

Except as otherwise provided in the Plan or the Confirmation Order, on and after the Confirmation Date:

(1) All entities which have held, currently hold or may hold a debt, claim, other liability or interest against any Debtor that would be dis-

charged upon Confirmation of this Plan and the Effective Date but for the provisions of section 1141(d)(3) of the Bankruptcy Code and Section VI.G.1. hereof are permanently enjoined from taking any of the following actions on account of such debt, claim, liability, interest or right: (a) commencing or continuing in any manner any action or other proceeding on account of such claim against property which is to be distributed under Section IV, V, or VI of this Plan, other than to enforce any right to distribution with respect to such property under the Plan; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against any property to be distributed to creditors under Section IV, V, or VI of this Plan, other than as permitted under subparagraph (a) above; and (c) creating, perfecting or enforcing any lien or encumbrance against any property to be distributed under Section IV, V, or VI, other than as permitted by this Plan.

(2) All non-Debtor persons and entities are permanently enjoined from commencing or continuing in any manner any action or other proceeding whether directly, derivatively or otherwise, on account of or respecting any claim, debt, right, cause of action, or liability released or to be released pursuant to the Comprehensive Settlement Agreement.

The Allied/Federated debtors proposed in the January 1992 proposed Allied chapter 11 plan that Bank of Montreal and Paribas each receive with respect to their respective claims identified as classes A-6, AR-6, and AO-6 approximately 4.83 percent of the total outstanding common stock of RHC, to be distributed from the shares of RHC common stock that Allied was to own and that New

Federated[31] was to own after the effective date of the January 1992 proposed Allied chapter 11 plan.

The Allied/Federated debtors proposed in the January 1992 proposed Allied chapter 11 plan that Allied retain in its capacity as a stockholder of RHC the shares of the RHC common stock that it was to own and that were not to be distributed to Bank of Montreal and Paribas (i.e., 6.6 percent of the outstanding common stock of RHC). New Federated, as the successor to Allied, was to retain and continue to own such stock.

In summary, the Allied/Federated debtors proposed in the January 1992 proposed Allied chapter 11 plan that the following companies own the following approximate percentages of the outstanding common stock of RHC after any distributions of that stock proposed in that proposed plan:

| Entity | Percentage of Outstanding Common Stock of RHC |
|---|---|
| Bank of Montreal | 4.8 |
| Paribas | 4.8 |
| New Federated | 6.6 |

In connection with the inclusion of the Ralphs transaction in the January 1992 proposed FSI chapter 11 plan and the January 1992 proposed Allied chapter 11 plan (collectively, the January 1992 proposed chapter 11 plans), EJDC, Federated, FSI, and RHC

[31]The January 1992 proposed Allied chapter 11 plan, like the October 1991 proposed Allied chapter 11 plan, provided that Allied and Federated were to merge into a single surviving entity to be known as New Federated.

entered into a certain agreement (proposed tax election agreement), which was to be effective as of the effective date of the January 1992 proposed FSI chapter 11 plan.  Those parties proposed in the proposed tax election agreement that FSI and New Federated (as successor to Federated) agree to prosecute diligently and in good faith a request to be submitted to the Internal Revenue Service (IRS) for certain rulings (section 382/384 rulings) regarding the application of sections 382 and 384 to the January 1992 proposed chapter 11 plans.

It was stated in the proposed tax election agreement that FSI, New Federated (as successor to Federated), and RHC agreed to prosecute diligently and in good faith a request to be submitted to the IRS for rulings (section 338(h)(10) rulings) that: (1) The Ralphs transaction constituted a qualified stock purchase under section 338(d)(3); (2) RHC would be entitled to make an election under section 338(a) and (h)(10) with respect to its acquisition of Ralphs; (3) FSI would be entitled to make an election under section 338(h)(10) with respect to the Ralphs transaction; and (4) any such elections would not adversely affect certain rulings that the IRS was expected to issue with respect to whether the merger of Allied and Federated[32] constituted a reorganization under section 368(a)(1)(G).

---

[32]See _supra_ note 27.

The proposed tax election agreement stated that FSI agreed to make an election under section 338(h)(10) if (1) the section 338(h)(10) rulings that the IRS issued were "favorable" and (2) RHC determined to make an election under section 338(a) and (h)(10).  FSI agreed to make that election whether or not the section 382/384 rulings that FSI and New Federated (as successor to Federated) requested from the IRS were "favorable".

The January 1992 proposed FSI chapter 11 plan was accepted in writing by each of the creditors and equity security holders whose acceptance was required under the Bankruptcy Code.  On January 10, 1992, the Ohio U.S. Bankruptcy Court confirmed the January 1992 proposed FSI chapter 11 plan.  (We shall refer to the January 1992 proposed FSI chapter 11 plan as confirmed by the Ohio U.S. Bankruptcy Court as the confirmed FSI chapter 11 plan.)  The effective date of the confirmed FSI chapter 11 plan was February 2, 1992.[33]  On January 10, 1992, the Ohio U.S. Bank-

---

[33]On Feb. 2, 1992, the proposed final indemnification agreement became effective.  Ralphs and RHC, or their successors, made all payments totaling $10 million required by that agreement.  Ralphs, RHC, or their successors claimed deductions for their respective payments in their respective tax returns for the taxable years in which they made any such payments.  In the notice of deficiency for its taxable years ended Jan. 31, 1993, Jan. 30, 1994, Jan. 28, 1995, and June 14, 1995, that respondent issued to petitioner RGC on July 11, 2006, respondent determined that if a valid election under sec. 338(h)(10) had been made with respect to the Ralphs transaction, the payments made under the final indemnification agreement would have been assumed or contingent liabilities and therefore would not have been deductible for the year of payment.  Petitioner RGC did not contest

(continued...)

ruptcy Court also confirmed the January 1992 proposed Allied chapter 11 plan. (We shall refer to the January 1992 proposed Allied chapter 11 plan as confirmed by the Ohio U.S. Bankruptcy Court as the confirmed Allied chapter 11 plan.) The effective date of the confirmed Allied chapter 11 plan was February 4, 1992.

The Ohio U.S. Bankruptcy Court stated in pertinent part in its order confirming the January 1992 proposed FSI chapter 11 plan (Ohio U.S. Bankruptcy Court's order) the following with respect to its confirmation of that proposed plan:

> C. The provisions of the Plan shall bind the [FSI] Debtors, the Reorganized Debtors and all creditors and equity security holders of any of the [FSI] Debtors, whether or not the respective claims or interests of such creditors or equity security holders are impaired under the Plan, whether or not such creditors and equity security holders have accepted the Plan, and whether or not such creditors and equity security holders have filed proofs of claim of interest or are deemed to have filed proofs of claim of interest.

> D. Except as otherwise provided in the Plan or this Order, on and after the Confirmation date:

> (1) All entities which have held, currently hold or may hold a debt, claim, other liability or interest against any [FSI] Debtor that would be discharged, upon Confirmation of the Plan and the Effective Date but for the provisions of section 1141(d)(3) of the Bankruptcy Code and Section VI.G.1 of the Plan are permanently enjoined from taking any of the following actions on account of such debt, claim, liability, interest or right: (a) commencing or continuing in any manner any

---

[33](...continued)
that determination in the petition that it filed with the Court.

action or other proceeding on account of such claim against property which is to be distributed under Section IV, V, or VI of the Plan, other than to enforce any right to distribution with respect to such property under the Plan; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against any property to be distributed to creditors under Section IV, V, or VI of the Plan, other than as permitted under subparagraph (a) above; and (c) creating, perfecting or enforcing any lien or encumbrance against any property to be distributed under section IV, V, or VI of the Plan, other than as permitted by the Plan.

(2) All non-Debtor entities and individuals are permanently enjoined from commencing or continuing in any manner, or otherwise prosecuting, any action or proceeding, whether directly, derivatively or otherwise, on account of or respecting any claim, debt, right, cause of action, or liability that is released or to be released pursuant to the Comprehensive Settlement Agreement; provided, however, that this injunction will not prevent any creditor (other than a Consenting Additional Party) of any [FSI] Debtor whose claim against a [FSI] Debtor is guaranteed by a third-party non-Debtor from prosecuting any direct claim against such third-party non-Debtor under any such guaranty.

The foregoing injunction shall apply to the holder of a debt, claim or interest, whether or not a proof of claim was Filed or deemed Filed, whether such claim was allowed, whether or not the holder of such claim accepted the Plan, and whether or not the right to payment was reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. Any person injured by any willful violation of this injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.

In the Ohio U.S. Bankruptcy Court's order, that court determined that the equity value of Ralphs was between $550 million and $637 million.

As set forth in the January 1992 proposed FSI chapter 11 plan and in the Ohio U.S. Bankruptcy Court's order, after the confirmation of that proposed plan EJDC, Bank of Montreal, Paribas, and Campeau, as the parties that filed creditor claims against the FSI debtors, were enjoined from further asserting any of the respective claims that they had asserted in the FSI chapter 11 proceedings.

After the Ohio U.S. Bankruptcy Court confirmed the January 1992 proposed chapter 11 plans, the FSI debtors and the Allied/Federated debtors took steps to comply with the requirements of the confirmed FSI chapter 11 plan and the confirmed Allied chapter 11 plan, respectively.

Immediately before the Ralphs transaction was effected, the primary assets of Holdings III consisted of: (1) All of the outstanding common stock of Holdings II, the assets of which included directly or indirectly the common stock and assets of Allied, Holdings, Federated, and their respective subsidiaries, (2) 83.75 percent of the outstanding common stock of Ralphs, (3) the Allied note, and (4) the Federated note.

The FSI consolidated group filed Form 1120 for its taxable year ended January 31, 1993 (FSI consolidated group 1/31/93

consolidated return).  The FSI consolidated group attached to
that return a consolidated balance sheet in which it reported,
based on book value, the following total assets and total liabil-
ities as of the beginning of that taxable year (i.e., February 1,
1992) of that group and of certain of its members:

| Company/Group | Total Assets[1] | Total Liabilities |
|---|---|---|
| FSI consolidated group | $11,471,163,367 | $14,460,193,630 |
| FSI | 227,757,850 | 1,513,035,371 |
| Holdings III | 180,293,905 | 179,775,064 |
| Holdings II | 470,188,023 | 471,458,182 |
| Holdings | 957,957 | 872,978 |
| Federated | 5,979,262,404 | 6,873,748,518 |
| Allied | 3,060,396,285 | 3,719,114,874 |
| Ralphs | 1,357,571,286 | 1,414,776,300 |

[1]The term "Total Assets" does not include any amount repre-
senting the value of intangible assets.  In the consolidated
balance sheet that the FSI consolidated group attached to the FSI
consolidated group 1/31/93 consolidated return, line 13A, "INTAN-
GIBLE ASSETS", was left blank for each member of that consoli-
dated group.

On January 29, 1992, Jan Charles Gray (Mr. Gray), an officer
of Ralphs, incorporated RHC under the laws of Delaware.  On
February 2, 1992, Mr. Gray approved a resolution that provided:

> RESOLVED FURTHER, that the fair consideration for such
> issuance of the common stock of the Corporation [RHC]
> is the contribution by Allied Stores Corporation and
> Federated Holdings III, Inc. of all of the issued and
> outstanding common stock of Ralphs Grocery Company;

On February 3, 1992, Allied, Holdings III, and RHC entered
into an agreement entitled "CONTRIBUTION AND SUBSCRIPTION AGREE-
MENT".  That agreement provided in pertinent part:

> D.  Allied, Holdings III, and Ralphs Holdings
> desire that the Holdings III Contributed Shares and the

Allied Contributed Shares be contributed to Ralphs Holdings, in each case in exchange for the issuance to Holdings III and Allied of the Ralphs Holding Common Stock, such that immediately after giving effect thereto Ralphs Holding will own all of the issued and outstanding shares of Ralphs Common Stock and Allied and Holdings III together will own all of the issued and outstanding shares of Ralphs Holding Common Stock in the same respective proportion as they together owned all of the issued and outstanding shares of Ralphs Common Stock immediately prior to giving effect thereto.

NOW, THEREFORE, the parties hereto hereby agree as follows:

1. Holdings III hereby contributes the Holdings III Contributed Shares to Ralphs Holding in exchange for the issuance to Holdings III of 27,758,527 shares of Ralphs Holding Common Stock ("Holdings III Ralphs Holding Shares"), and Ralphs Holding hereby accepts the transfer of the Holdings III Contributed Shares in full payment of the Holdings III Ralphs Holding Shares.

2. Allied hereby contributes the Allied Contributed Shares to Ralphs Holding in exchange for the issuance to Allied of 5,384,330 shares of Ralphs Holding Common Stock (the "Allied Ralphs Holding Shares"), and Ralphs Holding hereby accepts the transfer of the Allied Contributed Shares in full payment of Allied Holding Shares.

On February 3, 1992, pursuant to the confirmed FSI chapter 11 plan and the confirmed Allied chapter 11 plan, respectively, Holdings III and Allied transferred to RHC the respective outstanding common stock of Ralphs that they owned (i.e., 83.75 percent and 16.25 percent, respectively). Pursuant to those confirmed plans, RHC transferred to Holdings III and Allied 83.75 percent and 16.25 percent, respectively, of its outstanding common stock. As a result of those transfers, RHC acquired 100

percent of the outstanding common stock of Ralphs, which was the only class of voting stock of Ralphs and which accounted for over 80 percent of the total value of all of the stock of Ralphs that was outstanding on February 3, 1992. After the Ralphs transaction, RHC's only asset was the common stock of Ralphs that it owned.[34]

On February 3, 1992, as required by the confirmed FSI chapter 11 plan, Holdings III transferred the stock of RHC that it had received so that the following creditors of FSI owned the following approximate percentages of the outstanding common stock of RHC:

| FSI Creditor | Percentage of Outstanding Common Stock of RHC |
|---|---|
| EJDC | 60.4 |
| Campeau | 12.8 |
| Bank of Montreal | 5.3 |
| Paribas | 5.3 |

Holdings III did not transfer to FSI any stock or assets of Ralphs, RHC, Holdings, Holdings II, Allied, Federated, or any of their subsidiaries. FSI did not receive the Allied note or the Federated note from Holdings III.

Except for the common stock of Ralphs that it received from Allied as part of the Ralphs transaction, RHC did not receive any

---

[34]On Feb. 3, 1992, RHC and Ralphs entered into an agreement under which RHC agreed to perform accounting, advisory, capital raising, and other services for Ralphs in exchange for a fee equal to the direct and indirect costs to RHC of performing those services.

stock or assets of Holdings, Holdings II, Allied, Federated, or any of their subsidiaries. Nor did RHC receive from Holdings III the Allied note or the Federated note.

Neither FSI nor RHC received any of the outstanding preferred stock of Ralphs as part of the Ralphs transaction.

On February 3, 1992, as required by the confirmed Allied chapter 11 plan and pursuant to a certain written, binding agreement, Allied transferred the common stock of RHC that it had received so that the following entities owned the following approximate percentages of the outstanding common stock of RHC:

| Entity | Percentage of Outstanding Common Stock of RHC |
|---|---|
| Bank of Montreal | 4.8 |
| Paribas | 4.8 |
| Allied[1] | 6.6 |

[1] As discussed below, on Feb. 4, 1992, pursuant to the confirmed Allied chapter 11 plan, Allied and Federated merged into a single entity known as New Federated.

The distribution of the RHC stock to EJDC, Bank of Montreal, Paribas, and Campeau as required by the confirmed FSI chapter 11 plan and the confirmed Allied chapter 11 plan was not pro rata with respect to the respective amounts of the respective claims asserted by creditors and was not pro rata with respect to the status of those creditors as secured or unsecured creditors.

Pursuant to the confirmed FSI chapter 11 plan, Holdings III received with respect to its interest as the sole stockholder of Holdings II any cash remaining after Holdings II paid certain

administrative claims and priority claims against it and made all payments required to be made under that plan to certain of its unsecured creditors. Holdings III distributed that cash to FSI for distribution pursuant to the confirmed FSI chapter 11 plan.

Under the confirmed FSI chapter 11 plan, no property was distributed to the following companies with respect to their respective interests: (1) FSI did not receive any property with respect to its interest as the sole stockholder of Holdings III; (2) Holdings did not receive any property with respect to its interest as the sole stockholder of Federated; and (3) Holdings II did not receive any property with respect to its interest as the sole stockholder of Allied or with respect to its interest as a stockholder of Holdings.

On February 4, 1992, pursuant to the confirmed Allied chapter 11 plan, Allied and Federated merged into a single entity known as New Federated. As part of that merger, the operating assets of Allied's subsidiaries were transferred to New Federated. After the merger of Allied and Federated, all of their respective stock was canceled, and the stock of New Federated was issued to the respective creditors of the Allied/Federated debtors. For purposes of the distribution of the stock of New Federated pursuant to the confirmed Allied chapter 11 plan, the value of New Federated was estimated to be approximately $2,014,700,000 and the value of the New Federated common stock

that was distributed to creditors of the Allied/Federated debtors was estimated to be $25 per share.  The distribution of the stock of New Federated was not pro rata with respect to the respective amounts of the respective claims asserted by creditors and was not pro rata with respect to the status of those creditors as secured or unsecured creditors.

Pursuant to the confirmed Allied chapter 11 plan, Holdings III received 816,000 shares of common stock of New Federated with respect to its claim against Federated under the Federated Note. As required by the confirmed FSI chapter 11 plan, Holdings III (1) distributed 588,000 of those shares in satisfaction of general, unsecured creditor claims against FSI and Holdings III and (2) sold the remaining 228,000 shares to provide cash to FSI. No other property was distributed to or retained by Holdings III with respect to its claim against Federated under the Federated note.  Pursuant to the confirmed Allied chapter 11 plan, Holdings III contributed to Allied its claim against Allied under the Allied note.  No property was distributed to or retained by Holdings III on account of that claim against Allied.

On January 29, 1992, the same date on which Mr. Gray incorporated RHC, Ralphs issued an information statement (Ralphs information statement) to the persons who owned preferred stock of Ralphs and the persons who held certain rights under a certain equity appreciation rights plan (EAR plan) that Ralphs had

instituted in 1988.[35]  Ralphs attached the Ralphs information

statement to a memorandum from Byron Allumbaugh, the chairman and

the chief executive officer of Ralphs, that was addressed to all

the officers of Ralphs.  That memorandum stated:

> Enclosed for your review is an Information State-
> ment relating to the treatment of the outstanding
> Series A and Series B Preferred Stock ("Preferred
> Stock") of Ralphs Grocery Company and the Equity Rights
> outstanding under the Ralphs Grocery Company 1988
> Equity Appreciation Rights Plan in connection with the
> consummation of the plan of reorganization of Federated
> Stores, Inc., which is expected to occur February 3,
> 1992.  The Information Statement describes the planned
> redemption of your Preferred Stock, as well as certain
> proposed amendments to the Equity Appreciation Rights
> Plan and your individual Equity Rights Agreements
> negotiated by Ralphs.

> Please review the Information Statement carefully.
> It describes the salient differences between the cur-
> rent provisions of the Equity Appreciation Rights Plan
> and Equity Rights Agreements and the proposed amend-
> ments to be adopted with your consent.  The Information
> Statement also summarizes the terms of a Nonqualified
> Stock Option Plan to be adopted by Ralphs' new parent
> company.  As you know, it is proposed that each of you,
> as well as certain other key employees of Ralphs, will
> be granted options to purchase common stock of the
> parent company as described in the Information State-
> ment.

> Patrick Collins [one of the directors of Ralphs],
> Jan Charles Gray [Ralphs' senior vice president and
> general counsel], Alan Reed [Ralphs' chief financial
> officer] and I have spent many months considering and
> consulting with counsel and others concerning the
> proposed amendments to the Equity Appreciation Rights
> Plan, as well as possible alternatives.  We believe the

---

[35]The EAR plan was one of several separate executive compen-
sation arrangements that Ralphs had instituted.  The participants
in the EAR plan had the right to a percentage of the increase in
the appraised value of Ralphs over time.

amendments resolve fairly several issues under the Plan and, when combined with the grant of stock options, represents a very attractive ongoing incentive package. On this basis, Pat, Jan, Alan and I intend to approve the proposal and we urge each of you to do the same.

The Ralphs information statement described the material changes to the EAR plan that would be effected by the proposed amendments to that plan, as described in that statement. The proposed amendments to the EAR plan did not require the redemption of any outstanding preferred stock of Ralphs.

The Ralphs information statement described the approval necessary to make the proposed amendments to the EAR plan as follows:

### APPROVAL REQUIRED

The Amended Plan will become effective as of January 31, 1992 only if it is unanimously approved in writing by the holders of the Equity Rights. Attached as Annex C to this Information Statement is a form of Consent of Equity Rights Holder by which the holders are requested to evidence their approval of the Amended Plan and of the related First Amendment (attached hereto as Annex B) to the Agreement.

*To be effective, all such consents must be completed, signed and returned to Jan Charles Gray, Esq., General Counsel of Ralphs, on or before the close of business on January 31, 1992. In addition, each Equity Rights holder also must complete, sign and return the extra counterpart of the First Amendment to the Agreement enclosed herewith.* (Equity Rights holders may wish to keep a copy of their consent and the First Amendment as returned to Ralphs.)

The holders of Equity Rights are not required to consent to the adoption of the Amended Plan; however, the consequences of failing to do so are uncertain.

The Ralphs information statement also discussed the proposed redemption of the outstanding preferred stock of Ralphs. As of January 29, 1992, all of that preferred stock was owned by management and key employees of Ralphs. The Ralphs information statement stated in pertinent part as follows with respect to that proposed redemption:

> As the FSI plan for reorganization was being finalized, Ralphs' senior management engaged in discussions and negotiations with respect to the treatment of the outstanding Preferred Stock and the outstanding Equity Rights in connection with the reorganization. Under the provisions of the Plan, the consummation of the FSI plan of reorganization and the resulting change in ownership of Ralphs' outstanding common stock could possibly be deemed to constitute a "change in control" of Ralphs within the meaning of the Plan. As such, and as discussed below in more detail, the plan of reorganization had the potential to trigger an immediate cash payout obligation to the Equity Rights holders upon consummation of the plan of reorganization. To avoid this result, and to eliminate future charges to Ralphs' earnings for financial accounting purposes associated with the Plan, EJDC proposed certain modifications to the Plan designed to facilitate the FSI plan of reorganization while maintaining, to the extent practicable, the current benefits to the Equity Rights holders under the Plan. The proposed amendments to the Plan and the Agreements discussed below are the end result of these negotiations.

> \*       \*       \*       \*       \*       \*       \*

> REDEMPTION OF PREFERRED STOCK

> The Certificates of Designations (the "Certificates") setting forth the respective rights, preferences and privileges of Ralphs' outstanding Series A Preferred Stock and Series B Preferred Stock each provide for the mandatory redemption (i.e., repurchase) of the Preferred Stock in the event of a "change in control" as defined therein. The Certificates also permit Ralphs' to redeem the Preferred Stock at any

time upon five days prior notice to the Preferred Stock holders.  It is unclear whether the change in ownership of Ralphs' outstanding common stock that will result upon consummation of the FSI plan of reorganization would trigger a mandatory redemption of the Preferred Stock pursuant to the Certificates; in any event, however, Ralphs has agreed to redeem the Preferred Stock, subject to the consummation of the plan of reorganization of FSI, for the original price paid for the Preferred Stock of $10 per share in cash, or a total of $3 million.

*This Information statement will serve as the requisite notice of redemption under the Certificates.*  Please be advised, therefore, that all of the outstanding shares of Preferred Stock will be redeemed by Ralphs on or about February 5, 1992 (the "Redemption Date"), subject to the prior consummation of the plan of reorganization of FSI.

All shares of Preferred Stock will be redeemed, if any are redeemed.  Upon redemption, each holder of Preferred Stock will receive from Ralphs the Redemption Price of $10 per share.  On or after the Redemption Date, a holder of Preferred Stock will not have any rights as such holder other than the right to receive the redemption price upon surrender of the certificates evidencing his or her Preferred Stock.

The Ralphs information statement did not indicate that the redemption of the preferred stock of Ralphs was required or prohibited by the confirmed FSI chapter 11 plan or that any such redemption was part of or provided for in that plan.  The confirmed FSI chapter 11 plan contemplated that the preferred stock of Ralphs would be redeemed over the period 1992 to 1998, as specified in the terms of that preferred stock at the time that stock was issued.  The confirmed FSI chapter 11 plan stated in pertinent part as follows with respect to any redemption of the preferred stock:

Ralphs may redeem at its option the shares of Ralphs Preferred Stock held by any holder, at any time in whole or in part, at the Initial Purchase Price.

\*     \*     \*     \*     \*     \*     \*

The Ralphs Preferred Stock has no voting rights and may not be pledged or transferred except by the laws of descent and distribution.  In the event Ralphs is subjected to a "change in control" (as defined in Ralphs' certificate of incorporation, as amended), all outstanding shares of Ralphs Preferred Stock will be redeemed at the Initial Purchase Price.  The change in ownership of Ralphs Common Stock that will occur pursuant to the Plan may trigger the change in control provision with respect to the Ralphs Preferred Stock, thereby requiring redemption of the outstanding shares.

On February 2, 1992, an attorney with Morrison & Foerster, attorneys for FSI, sent a letter to the board of directors of Ralphs.  In that letter, the attorney stated his opinion that "under subsection 4.20 of the indenture dated as of August 26, 1988 between Ralphs and the United States Trust Company of New York as trustee with respect to Ralphs 14 percent Senior Subordinated Debentures due 2000 (the "Indenture")" the Ralphs transaction would not result in a "change of control".

Each of the holders of rights under the EAR plan acknowledged having read and received the Ralphs information statement and consented to the amendments to the EAR Plan that were described in that information statement.

On February 3, 1992, EJDC, Bank of Montreal, Paribas, Camdev Properties, Inc.,[36] Allied, and FSI,[37] as the stockholders of RHC, elected directors of RHC (RHC board of directors). On that date, the RHC board of directors met via telephonic conference. At that meeting, the RHC board of directors, acting on behalf of RHC as the sole common stockholder of Ralphs, elected new directors of Ralphs (Ralphs board of directors).

On February 3, 1992, the Ralphs board of directors met via telephonic conference. At that meeting, the Ralphs board of directors approved resolutions (1) ratifying and approving all of the actions of and resolutions approved by the prior board of directors of Ralphs with respect to the confirmed FSI chapter 11 plan, including the issuance of the Ralphs information statement, and authorizing the officers and directors of Ralphs to take all necessary actions to effect the transactions required by the confirmed FSI chapter 11 plan and (2) calling for the redemption

---

[36]Camdev Properties, Inc., which was an assignee of Campeau, received approximately 12 percent of the total outstanding common stock of RHC pursuant to the confirmed FSI chapter 11 plan.

[37]As discussed above, under the confirmed FSI chapter 11 plan, Holdings III distributed to FSI a portion (i.e., 0.8 percent) of the outstanding common stock of RHC that was to be distributed to Campeau for subsequent sale for the purpose of satisfying certain obligations and expenses arising under that plan. To the extent FSI did not sell any portion of that stock, the confirmed FSI chapter 11 plan required that FSI distribute that portion to Campeau.

on February 3, 1992, of all of the preferred stock of Ralphs.  On February 3, 1992, the RHC board of directors passed a resolution approving the decision of the Ralphs board of directors to redeem all of the outstanding preferred stock of Ralphs.

Neither the Ralphs information statement nor the minutes of the respective board meetings of the Ralphs board of directors and the RHC board of directors indicated whether or not the $3 million required to redeem all of the outstanding preferred stock was to be deposited into an escrow account.

No mention was made in the confirmed FSI chapter 11 plan, the confirmed Allied chapter 11 plan, the FSI disclosure statement, or the Allied disclosure statement of any negotiations among the FSI debtors, the Allied/Federated debtors, Ralphs, RHC, EJDC, Bank of Montreal, Paribas, or Campeau with respect to a redemption of the outstanding preferred stock of Ralphs.  Nor did any of those documents discuss a planned redemption of that stock.

No discussion appeared in the comprehensive settlement agreement, the proposed initial indemnification agreement, the proposed final indemnification agreement, or the proposed tax election agreement regarding a planned redemption of the outstanding preferred stock of Ralphs.

Form 10-K, ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934, that Ralphs filed in May 1992

with the U.S. Securities and Exchange Commission (SEC) for its fiscal year ended February 2, 1992 (1992 Form 10-K) stated that all of the preferred stock of Ralphs remained outstanding as of February 2, 1992, the last day of Ralphs' fiscal year, and that that stock was subsequently redeemed for $3 million. In a section titled "Ownership of the Company", the 1992 Form 10-K stated that "Since February 3, 1992 (the "Transfer Date"), all of the outstanding capital stock of the Company, consisting of 100 shares of common stock, par value $1.00 per share (the "Common Stock"), has been held by Ralphs Supermarkets, Inc. (the "Holding Company"), a Delaware Corporation."

Ralphs attached a balance sheet to the 1992 Form 10-K. Ralphs reported in that balance sheet the outstanding preferred stock as a $3 million liability, and not as stockholders equity, as of the end of each of its fiscal years ended February 2, 1991, and February 3, 1992. The respective amounts of total assets and total liabilities as of February 2, 1992, that Ralphs reported in the balance sheet that it attached to the 1992 Form 10-K were equal to the respective amounts of total assets and total liabilities that the FSI consolidated group reported in the balance sheets that the FSI consolidated group attached to the FSI consolidated group 1/31/93 consolidated return.[38]

---

[38]In the respective consolidated balance sheets that the FSI consolidated group attached to the FSI consolidated group 1/31/91 (continued...)

On July 13, 1992, the Ralphs board of directors held a meeting via telephonic conference. At that meeting, the Ralphs board of directors adopted a resolution declaring that no preferred stock of Ralphs remained outstanding, prohibiting the issuance of any preferred stock in the future, and eliminating all references to preferred stock in Ralphs' certificate of incorporation.

Pursuant to the confirmed FSI chapter 11 plan, on February 3, 1992, RHC, Ralphs, Allied, Bank of Montreal, Paribas, EJDC, Camdev Properties, Inc., and FSI entered into a certain registration rights agreement as part of the Ralphs transaction. RHC granted to its stockholders under that agreement certain registration rights that permitted those stockholders to participate in certain registration offerings that RHC might make of its stock and allowed them to demand that RHC register the stock that those stockholders received pursuant to the confirmed FSI chapter 11 plan and the confirmed Allied chapter 11 plan.

---

[38](...continued)
consolidated return and the FSI consolidated group 1/31/93 consolidated return, line 22A, "CAPITAL STOCK - PREFERRED", was blank with respect to Ralphs. That is because, unlike the financial statement balance sheets that Ralphs attached to the 1992 Form 10-K, there was no line item for "Redeemable preferred stock" in those consolidated balance sheets.

Within three months after the Ralphs transaction was effected, RSI (i.e., Ralphs and Ralphs Supermarkets, Inc.)[39] developed a recapitalization plan for those two companies. As a result, RSI filed a registration statement with the SEC with respect to a proposed public offering of the shares of common stock of RSI. Ralphs filed a registration statement with the SEC with respect to a proposed offering of $300 million of Ralphs' senior subordinated notes.

On January 21, 1993, Holdings III dissolved pursuant to the laws of Delaware. The certificate of dissolution was signed by FSI as the sole stockholder of Holdings III. On the same date, Holdings, Holdings II, and CPI also dissolved. On July 19, 1993, FSI dissolved pursuant to the laws of Delaware. The respective common stock of Holdings III and FSI was canceled upon the dissolution of each of those companies. At no time did Holdings III receive any of its own stock from FSI.

In an order dated June 30, 1993, the Ohio U.S. Bankruptcy Court found that the estate of each of the FSI debtors had been fully administered, granted in its entirety FSI's motion for a final decree, and entered a final decree closing the FSI chapter 11 proceedings.

---

[39]In April 1992, RHC changed its name to Ralphs Supermarkets, Inc.

In an order dated June 25, 2001, the Ohio U.S. Bankruptcy Court found that the respective estates of the Allied debtors and the Federated debtors had been fully administered and entered a final decree closing the Allied chapter 11 proceedings.

Around October 12, 1993, FSI filed the FSI consolidated group 1/31/93 consolidated return. Ralphs was a member of the FSI consolidated group during the period February 1 to 3, 1992.

The FSI consolidated group attached Form 8023, Corporate Qualified Stock Purchase Elections (Form 8023), to the FSI consolidated group 1/31/93 consolidated return. In that form, FSI (1) identified (a) itself as the common parent of the selling group, (b) "Ralphs Supermarkets, Inc." as the purchasing corporation, and (c) "Ralphs Grocery Company" as the target corporation and (2) checked the box "Joint election under section 338(h)(10)". The FSI consolidated group also attached to the FSI consolidated group 1/31/93 consolidated return a "Schedule Required Under Regs. 1.338-1T(e)(1) as to Includable Affected Targets". In that schedule, FSI identified "Ralphs Grocery Company" as the includible target and reported that the percentage of Ralphs stock owned was 100 percent. FSI did not attach to the FSI consolidated group 1/31/93 consolidated return a copy of the confirmed FSI chapter 11 plan. FSI also did not attach to that return a statement executed under penalties of perjury that

showed the purposes of or that detailed all the transactions incident or pursuant to the confirmed FSI chapter 11 plan.

FSI reported in the FSI consolidated group 1/31/93 consolidated return that $475 million of consideration was paid in the Ralphs transaction, that Ralphs had total liabilities of $1,164,390,700, and that Ralphs was subject to an election under section 338(h)(10). FSI identified all of the $475 million of consideration that it reported as paid in the Ralphs transaction as "Debt of Federated Stores, Inc., and Subsidiaries held by creditors". FSI did not report in the FSI consolidated group 1/31/93 consolidated return any amount of "cash" or "purchase money debt" as part of the consideration paid in the Ralphs transaction.

The FSI consolidated group attached Schedule D, Capital Gains and Losses (1/31/93 Schedule D), to the FSI consolidated group 1/31/93 consolidated return. In that schedule, FSI reported with respect to the transaction in which Federated incorporated Ralphs long-term capital gain of $492,618,173 (i.e., the Ralphs deferred intercompany gain) and ordinary income of $81,723,870. In addition, FSI reported in that schedule with respect to the Ralphs transaction a gross sale price of $1,639,390,700, a cost or other basis, plus expense of sale, of $1,303,501,700, and a long-term capital gain of $335,889,000 that

resulted from the election under section 338(h)(10) that FSI made with respect to the Ralphs transaction.[40]

The FSI consolidated group owed no Federal tax for the taxable year ended January 31, 1993, except for the alternative minimum tax, certain recapture taxes, and certain environmental taxes.  Taking into account the gain reported on the 1/31/93 Schedule D, FSI showed gain in excess of $900 million resulting from the Ralphs deferred intercompany gain and the election under section 338(h)(10) that it made with respect to the Ralphs transaction.  That gain was offset by a net operating loss deduction available to the FSI consolidated group for the taxable year ended January 31, 1993.

RSI filed Form 1120 for its consolidated group, which included Ralphs, for each of the taxable years ended January 31, 1993 (RSI consolidated group 1/31/93 consolidated return), January 30, 1994, January 28, 1995, and June 14, 1995.  RSI filed an amended consolidated group return for the taxable year ended January 31, 1993 (RSI consolidated group 1/31/93 amended consolidated return), which the IRS received around November 18, 1993, and treated as filed on that date.

---

[40]FSI also attached to the FSI consolidated group 1/31/93 consolidated return Form 8594, Asset Acquisition Statement.  In that form, FSI reported a total sale price and assets transferred of $1,639,390,700 with respect to the Ralphs transaction.

In the respective RSI consolidated returns filed for the taxable years ended January 31, 1993, January 30, 1994, January 28, 1995, and June 14, 1995, the Ralphs transaction was treated as a purchase under section 338(h)(3) because a timely election under section 338(h)(10) had been made.

RSI attached Form 8023 to both the RSI consolidated group 1/31/93 consolidated return and the RSI consolidated group 1/31/93 amended consolidated return.  In that form, RSI (1) identified itself as the purchasing corporation and "Ralphs Grocery Company" as the target corporation and (2) checked the box "Joint election under section 338(h)(10)".  RSI also attached to the RSI consolidated group 1/31/93 consolidated return a "Schedule Required Under Regs. 1.338-1T(e)(1) as to Includable Affected Targets".  In that schedule, RSI identified "Ralphs Grocery Company" as the includible target and reported that the percentage of Ralphs stock owned was 100 percent.  RSI did not attach to the RSI consolidated group 1/31/93 consolidated return or the RSI consolidated group 1/31/93 amended consolidated return a copy of the confirmed FSI chapter 11 plan.  RSI also did not attach to either of those returns a statement executed under penalties of perjury that showed the purposes of or that detailed all the transactions incident or pursuant to the confirmed FSI chapter 11 plan.

RSI reported in the RSI consolidated group 1/31/93 consolidated return that $475 million of consideration was paid in the Ralphs transaction, that Ralphs had total liabilities of $1,164,390,700, and that Ralphs was subject to an election under section 338(h)(10).  RSI identified all of the $475 million of consideration that it reported as paid in the Ralphs transaction as "Debt of Federated Stores, Inc., and Subsidiaries held by creditors".  RSI did not report in the RSI consolidated group 1/31/93 consolidated return any amount of "cash" or "purchase money debt" as part of the consideration paid.

RSI attached Form 8594 to the RSI consolidated group 1/31/93 consolidated return and the RSI consolidated group 1/31/93 amended consolidated return.  In that form, RSI reported a total sale price and assets transferred of $1,639,390,700.  In Form 8594, RSI allocated that sale price to certain classes of assets as follows:

| Asset Class | Amount |
| --- | --- |
| Class I | $36,800,000 |
| Class II | -0- |
| Class III | 1,006,964,727 |
| Class IV | 595,625,973 |

In the RSI consolidated group 1/31/93 consolidated return and the RSI consolidated group 1/31/93 amended consolidated return, pursuant to section 13261(g)(2) and (3) of the Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, sec. 13261(g),

107 Stat. 540, RSI elected retroactive application of section 197, entitled "Amortization of Goodwill and Certain Other Intangibles".

On June 14, 1995, Food 4 Less Holdings, Inc. (Food 4 Less), acquired all of the outstanding common stock of RSI. On the same date, Food 4 Less merged Ralphs with and into RSI, with RSI as the surviving corporation. RSI changed its name after that merger to Ralphs Grocery Company (RGC).[41]

On March 10, 1998, Fred Meyer acquired all of the common stock of Food 4 Less in a merger. As a result of that merger, Food 4 Less became a wholly owned subsidiary of Fred Meyer.

## Discussion

In their respective motions for partial summary judgment, the parties ask us to decide whether RHC and FSI made a valid joint election under section 338(h)(10) with respect to RHC's acquisition of all of the outstanding common stock of Ralphs from Holdings III and Allied that took place as part of the Ralphs transaction. Before we address that issue, we shall briefly summarize the Ralphs transaction that took place pursuant to the confirmed FSI chapter 11 plan and the confirmed Allied chapter 11 plan. In that transaction, RHC, a newly formed company, acquired all of the outstanding common stock of Ralphs from Holdings III

---

[41]RHC, RSI, and RGC are all the same entity, which is not the same entity as Ralphs.

and Allied, the respective owners of 83.75 percent and 16.25 percent of that outstanding stock. In exchange for the respective Ralphs stock that RHC acquired from Holdings III and Allied, RHC issued to those companies 83.75 percent and 16.25 percent, respectively, of its outstanding common stock. Thereafter, (1) Holdings III distributed all of the outstanding RHC common stock that it held to EJDC, Bank of Montreal, Paribas, and Campeau,[42] which were certain of FSI's creditors, and (2) Allied (a) distributed a portion (i.e., 9.65 percent) of the outstanding RHC common stock that it held to Bank of Montreal and Paribas, which were certain of Allied's creditors, and (b) retained the balance (i.e., 6.6 percent).[43] After those distributions to the respective creditors of FSI and Allied, those creditors owned the following approximate percentages of the outstanding common stock of RHC:

| Owner | Percentage of Outstanding Common Stock of RHC |
|---|---|
| EJDC | 60.4 |
| Campeau | 12.8 |
| Bank Montreal | 10.1 |
| Paribas | 10.1 |

---

[42]Campeau owned 100 percent of the outstanding stock of FSI.

[43]As part of the confirmed Allied chapter 11 plan, Allied merged with and into Federated, and the resulting company was known as New Federated. As a result of that merger, New Federated held the assets of Allied, which included 6.6 percent of the outstanding RHC common stock that Allied had retained under the confirmed Allied chapter 11 plan.

The parties agree that there are no genuine issues of material fact[44] and that summary adjudication is appropriate with respect to the issue under section 338(h)(10) that the parties ask us to decide in their respective motions for partial summary judgment. The parties also agree that (1) our resolution of the issue under section 338(h)(10) depends on whether RHC's acquisition of all of the outstanding common stock of Ralphs from Holdings III and Allied constitutes a qualified stock purchase under section 338(d)(3); (2) our resolution of that question under section 338(d)(3) depends on whether that acquisition constitutes a purchase under section 338(h)(3);[45] and (3) our

---

[44]See supra note 1.

[45]Sec. 338(h)(3) defines the term "purchase" in pertinent part as follows:

SEC. 338(h). Definitions and Special Rules.--For purposes of this section [338]--

* * * * * * *

(3) Purchase.--

(A) In general.--The term "purchase" means any acquisition of stock, but only if--

(i) the basis of the stock in the hands of the purchasing corporation is not determined (I) in whole or in part by reference to the adjusted basis of such stock in the hands of the person from whom acquired, * * * [and]

(ii) the stock is not acquired in an exchange to which section 351, 354,

(continued...)

resolution of that question under section 338(h)(3), and there-
fore our resolution of the question under section 338(d)(3),
depends on whether, as respondent maintains and petitioners
dispute, the Ralphs transaction constitutes a reorganization
under section 368(a)(1)(B), (C), or (G).  We thus address whether
the Ralphs transaction constitutes a reorganization under section
368(a)(1)(B), (C), or (G).[46]

It is the position of respondent that RHC's acquisition of
the outstanding common stock of Ralphs from Holdings III and

---

[45](...continued)
> 355, or 356 applies and is not acquired
> in any other transaction described in
> regulations in which the transferor does
> not recognize the entire amount of the
> gain or loss realized on the transaction
> * * *

Respondent argues, inter alia, that as part of the Ralphs
transaction stock was acquired in an exchange to which sec. 354
applies and that therefore RHC's acquisition of the outstanding
common stock of Ralphs does not constitute a purchase because of
sec. 338(h)(3)(A)(ii).  Sec. 354 applies only to a transaction
that qualifies as a reorganization under sec. 368(a)(1).  Turnbow
v. Commissioner, 368 U.S. 337, 343 (1961).  If we were to find
that the Ralphs transaction does not qualify as a reorganization
under sec. 368(a)(1)(B), (C), or (G), sec. 354 would not apply.

[46]Our discussion is limited to the three types of reorgani-
zations on which respondent relies (i.e., the reorganizations
described in sec. 368(a)(1)(B), (C), and (G)) in support of
respondent's position in respondent's motion.  The parties agree
that if the Ralphs transaction were to be treated as a reorgani-
zation qualifying under sec. 368(a)(1)(B), the target corporation
would be Ralphs.  The parties also agree that if the Ralphs
transaction were to be treated as a reorganization qualifying
under sec. 368(a)(1)(C) or (G), the target corporation would be
Holdings III.

Allied does not constitute a purchase under section 338(h)(3) and therefore does not constitute a qualified stock purchase under section 338(d)(3).  That is because, according to respondent, the Ralphs transaction qualifies as a reorganization under section 368(a)(1)(B), (C), and (G), and consequently RHC has a carryover basis under section 362 in the respective Ralphs common stock that it received from Holdings III and Allied.  See sec. 338(h)(3)(A)(i)(I).[47]  Respondent does not dispute that if we were to find that the Ralphs transaction does not qualify as a reorganization under section 368(a)(1)(B), (C), or (G), RHC's acquisition of all of the outstanding common stock of Ralphs from Holdings III and Allied would, as petitioners maintain, constitute a purchase under section 338(h)(3) and a qualified stock purchase under section 338(d)(3), and consequently RHC and FSI would have made a valid joint election under section 338(h)(10) with respect to that purchase.

Section 368 sets forth certain statutory requirements in order for a transaction to qualify as a reorganization under section 368(a)(1)(B), (C), or (G).  See, e.g., sec. 368(a)(1)(B), (C), (G), (2), (b).  In addition to those statutory requirements, the courts have established certain nonstatutory requirements in order for a transaction to qualify as a reorganization under any of those provisions of that section.  One of those nonstatutory

---

[47]See supra note 45.

requirements known as the continuity-of-interest requirement
mandates that "the taxpayer's ownership interest in the prior
organization must continue in a meaningful fashion in the reorga-
nized enterprise." Paulsen v. Commissioner, 469 U.S. 131, 136
(1985); see LeTulle v. Scofield, 308 U.S. 415 (1940); Pinellas
Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462 (1933).
According to the Supreme Court of the United States (Supreme
Court), "this interest must be definite and material; [and] it
must represent a substantial part of the value of the thing
transferred." Helvering v. Minn. Tea Co., 296 U.S. 378, 385
(1935); see Paulsen v. Commissioner, supra; secs. 1.368-1(b),
1.368-2(b)(2), Income Tax Regs. We limit ourselves to consider-
ation of the continuity-of-interest requirement. That is because
our resolution of whether the Ralphs transaction satisfies that
requirement resolves the question of whether that transaction
constitutes a reorganization under section 368(a)(1)(B), (C), or
(G).

For 1992, the year in which the Ralphs transaction occurred,
transitory ownership of stock in the acquiring corporation by the
transferor's stockholders is to be disregarded in determining
whether the continuity-of-interest requirement is satisfied.[48]

---

[48]Under regulations applicable to transactions occurring
after Jan. 28, 1998, the continuity-of-interest requirement is
satisfied regardless of whether the stockholders of the trans-
feror dispose of their stock in the acquiring company after those
(continued...)

See, e.g., <u>Penrod v. Commissioner</u>, 88 T.C. 1415, 1427 (1987); <u>Heintz v. Commissioner</u>, 25 T.C. 132, 142-143 (1955).

Respondent maintains that the continuity-of-interest requirement would be satisfied with respect to the Ralphs transaction if certain creditors of FSI[49] were treated as equity owners of FSI for purposes of the reorganization provisions on which respondent relies.  In support of respondent's argument that those creditors should be treated as equity owners for those purposes, respondent relies on <u>Helvering v. Ala. Asphaltic Limestone Co.</u>, 315 U.S. 179 (1942) (<u>Alabama Asphaltic</u>), which respondent maintains "is squarely applicable in this case [sic]".[50]  According to respondent:

---

[48](...continued)
stockholders receive that stock.  See T.D. 8760, 1998-1 C.B. 803, 804.

[49]Pursuant to the confirmed FSI chapter 11 plan, certain creditors of FSI received 83.75 percent of all of the outstanding common stock of RHC.  See <u>infra</u> note 54.  Thus, the parties focus their arguments with respect to whether the Ralphs transaction satisfies the continuity-of-interest requirement on the receipt of certain RHC stock by certain creditors of FSI and do not focus on the receipt of certain RHC stock by certain creditors of Allied.  We shall do the same.

[50]It is respondent's position that Congress' enactment into the Code of sec. 368(a)(1)(G) did not "change or eliminate the fundamental stepping into the shoes principle of <u>Alabama Asphaltic</u>."  According to respondent:

> The law that was adopted as the "G" reorganization in 1980 [Bankruptcy Tax Act of 1980, Pub. L. 96-589, sec. 4, 94 Stat. 3401] specifically approved the application of <u>Alabama Asphaltic</u> and extended its principle to

(continued...)

The [Supreme] Court's rule stated in <u>Alabama Asphaltic</u>
is simple and direct.  A valid reorganization in which
the stock of the newly-created entity is transferred to
the creditors of a corporation rather than the stock-
holders requires that:  1) the debtor corporation must
be insolvent; and 2) the insolvent debtor corporation's
creditors must receive the stock in the entity pursuant
to a reorganization plan.  <u>Alabama Asphaltic</u>, 315 U.S.
183-84.  * * *

Relying on what respondent calls the "simple and direct"

rule of <u>Alabama Asphaltic</u>, respondent concludes that

the bankruptcy of FSI qualifies its creditors as equity
holders for continuity of interest purposes.  * * *
Therefore, the distribution by Holdings III of 83.75
percent of the stock of RHC to FSI's creditors main-
tains the qualification under the continuity of inter-
est doctrine.

Respondent acknowledges that under <u>Alabama Asphaltic</u> "the

creditors must take effective command over the insolvent * * *

corporation's assets".  According to respondent, such "effective

command"

is vital to finding continuity of interest, and * * *
is present in this case [sic]. * * * The creditors of
FSI took overt steps to exert their control over its
assets.  FSI's assets included the Ralphs stock.  While

---

[50](...continued)
creditors who had less than senior rights but who
became post-bankruptcy shareholders. * * *

Petitioners do not disagree with respondent's statements
with respect to the effect of the enactment of sec. 368(a)(1)(G)
on the principles of <u>Alabama Asphaltic</u>.  We thus address the only
issue with respect to the continuity-of-interest requirement that
respondent argues.  As discussed below, that issue is whether
under <u>Alabama Asphaltic</u> we should treat certain creditors of FSI
as equity owners of FSI for purposes of determining whether the
continuity-of-interest requirement is satisfied in the Ralphs
transaction.

Ralphs was not the bankrupt corporation, Ralphs stock was undeniably an asset of FSI, and was ultimately taken possession of by FSI's creditors in the bankruptcy plan. [Citation omitted.]

In support of respondent's contention that "the creditors of FSI took overt steps to exert their control over its [FSI's] assets", respondent asserts that

on the date that EJDC and the other creditors instituted bankruptcy proceedings, they stepped into the shoes of Campeau and became the equity owners of FSI and of all that FSI owned. They thereby gained effective command over the assets of FSI.

Petitioners counter that the instant cases are materially distinguishable from Alabama Asphaltic.[51]

In Alabama Asphaltic,

The old corporation [Alabama Rock Asphalt, Inc.] was a subsidiary of a corporation which was in receivership in 1929. Stockholders of the parent had financed the old corporation taking unsecured notes for their advances. Maturity of the notes was approaching and not all of the noteholders would agree to take stock for their claims. Accordingly, a creditors' committee was formed, late in 1929, and a plan of reorganization was proposed to which all the noteholders, except two, assented. The plan provided that a new corporation would be formed which would acquire all the assets of the old corporation. The stock of the new corporation, preferred and common, would be issued to the creditors in satisfaction of their claims. Pursuant to the plan,

_____

[51]Petitioners also maintain that the instant cases are materially distinguishable from the cases decided after Helvering v. Ala. Asphaltic Limestone Co., 315 U.S. 179 (1942), that have found that case to be controlling in holding that certain creditors involved in those cases should be treated as equity owners for purposes of the continuity-of-interest requirement. (We shall refer to those cases decided after Alabama Asphaltic that have so held and that the parties cite as the Alabama Asphaltic progeny.)

involuntary bankruptcy proceedings were instituted in 1930. * * * The bankruptcy trustee offered the [insolvent corporation's] assets for sale at public auction. They were bid in by the creditors' committee for $150,000. * * * Thereafter, respondent [Alabama Asphaltic Limestone Co.] was formed and acquired all the assets of the bankrupt corporation. It does not appear whether the acquisition was directly from the old corporation on assignment of the bid or from the committee. Pursuant to the plan, respondent issued its stock to the creditors of the old corporation--over 95% to the noteholders and the balance to small creditors. * * *

Helvering v. Ala. Asphaltic Limestone Co., supra at 181-182.

On the basis of the above-quoted facts, the Supreme Court concluded in Alabama Asphaltic that the continuity-of-interest requirement enunciated in cases like Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462 (1933), and LeTulle v. Scofield, 308 U.S. 415 (1940), was not satisfied

since the old stockholders were eliminated by the plan, no portion whatever of their proprietary interest being preserved for them in the new corporation. And it is clear that the fact that the creditors were for the most part stockholders of the parent company does not bridge the gap. The equity interest in the parent is one step removed from the equity interest in the subsidiary. In any event, the stockholders of the parent were not granted participation in the plan qua stockholders.

Helvering v. Ala. Asphaltic Limestone Co., supra at 183.

Nonetheless, the Supreme Court concluded in Alabama Asphaltic on the facts there involved

that it is immaterial that the transfer shifted the ownership of the equity in the property from the stockholders to the creditors of the old corporation. Plainly, the old continuity of interest was broken. Technically, that did not occur in this proceeding

until the judicial sale took place.  For practical
purposes, however, it took place not later than the
time when the creditors took steps to enforce their
demands against their insolvent debtor.  In this case,
that was the date of the institution of bankruptcy
proceedings.  From that time on, they had effective
command over the disposition of the property.  The full
priority rule of Northern Pacific Ry. Co. v. Boyd, 228
U.S. 482, applies to proceedings in bankruptcy as well
as to equity receiverships.[52]  It gives creditors,
whether secured or unsecured, the right to exclude
stockholders entirely from the reorganization plan when
the debtor is insolvent.  When the equity owners are
excluded and the old creditors become the stockholders
of the new corporation, it conforms to realities to
date their equity ownership from the time when they
invoked the processes of the law to enforce their
rights of full priority.  At that time they stepped
into the shoes of the old stockholders.  The sale "did
nothing but recognize officially what had before been
true in fact."  Helvering v. New Haven & S.L.R. Co.,
121 F.2d 985, 987 [2d Cir. 1941].

That conclusion involves no conflict with the
principle of the Le Tulle case.[53]  A bondholder inter

---

[52]In N. Pac. Ry. Co. v. Boyd, 228 U.S. 482 (1913), the
Supreme Court held that a court-approved plan of reorganization
under which an insolvent corporation sold its assets to a new
corporation that the stockholders and certain bondholders of the
insolvent corporation owned did not serve to eliminate or defeat
the claim of an unsecured creditor of the insolvent corporation
who sought to enforce against the new corporation a judgment
against the insolvent corporation.  The Supreme Court held that
the unsecured creditor's interest was superior to the interest of
the stockholders of the insolvent corporation and that those
stockholders took their interest in the new corporation subject
to the claim of the unsecured creditor.

[53]The "Le Tulle case" to which the Supreme Court referred is
LeTulle v. Scofield, 308 U.S. 415 (1940).  In that case, the
Supreme Court held that there was no tax-free reorganization
where the transferor company transferred its assets in exchange
for cash and short-term notes of the transferee company.  In so
holding, the Supreme Court concluded that, where the consider-
ation for the transfer consisted solely of the transferee's
bonds, the transferor did not retain any proprietary interest in

(continued...)

est in a solvent company plainly is not the equivalent of a proprietary interest, even though upon default the bondholders could retake the property transferred. The mere possibility of a proprietary interest is, of course, not its equivalent. But the determinative and controlling factors of the debtor's insolvency and an effective command by the creditors over the property were absent in the Le Tulle case. [Citations omitted.]

Helvering v. Ala. Asphaltic Limestone Co., 315 U.S. at 183-184.

The parties in the instant cases agree, and we conclude, that it was material to the Supreme Court's holding in Alabama Asphaltic that the continuity-of-interest requirement was satisfied that the creditors "had effective command over the disposition of the property", id. at 183, of the insolvent debtor corporation. A principal disagreement between the parties here centers on the identity under Alabama Asphaltic of the insolvent debtor corporation over whose property its creditors must have such "effective command".

Petitioners argue that under Alabama Asphaltic (1) the insolvent corporation over whose property its creditors must have "effective command" must be the target corporation in the purported reorganization, and (2) the direct creditors of that target corporation must receive the stock of the company that acquired the stock of the insolvent target corporation or its property. According to petitioners, under Alabama Asphaltic the continuity-of-interest requirement is not satisfied in the

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[53](...continued)
the new company.

instant cases because (1) Ralphs, which the parties agree would be the target in the case of a reorganization qualifying under section 368(a)(1)(B), and Holdings III, which the parties agree would be the target in the case of a reorganization qualifying under section 368(a)(1)(C) or (G), were solvent at all times during the chapter 11 proceedings, and (2) neither Ralphs nor Holdings III had any creditors who received RHC stock in the Ralphs transaction.[54]

Respondent does not dispute (1) that Ralphs and Holdings III were solvent at all times during the chapter 11 proceedings and (2) that neither Ralphs nor Holdings III had any creditors who received RHC stock in the Ralphs transaction.[55]  Respondent argues instead that under Alabama Asphaltic (1) the insolvent corporation over whose property its creditors must obtain "effective command" need not be the target corporation in the purported

---

[54]Pursuant to the confirmed FSI chapter 11 plan, Campeau was to receive 12.8 percent of the outstanding common stock of RHC.  However, 0.8 percent of the outstanding common stock of RHC that Campeau was to receive was to be distributed to FSI pursuant to that plan.  FSI was required to sell that stock for the purpose of satisfying certain obligations and expenses arising under the confirmed FSI chapter 11 plan.  To the extent FSI did not sell any portion of the 0.8 percent of the outstanding common stock of RHC that it received, FSI was required under that plan to distribute that portion to Campeau.

[55]See supra note 54.

reorganization,[56] and (2) the direct creditors of that target corporation need not receive the stock of the company that acquired the stock of the insolvent target corporation or its property. According to respondent, in determining whether the continuity-of-interest requirement is satisfied in the Ralphs transaction, it is appropriate and necessary under <u>Alabama Asphaltic</u> to inquire (1) whether the creditors of the insolvent FSI, which the parties agree would not be a target corporation in the case of a reorganization qualifying under section 368(a)(1)(B), (C), or (G), "had effective command over the disposition of the property [of FSI]", <u>Helvering v. Ala. Asphaltic Limestone Co.</u>, <u>supra</u> at 183, and (2) whether the creditors of the insolvent FSI received the stock of RHC. Respondent maintains that the parties' agreed facts require affirmative answers to the foregoing inquiries.

We need not resolve the parties' disputes over (1) whether or not under <u>Alabama Asphaltic</u> the insolvent corporation over whose property its creditors must have "effective command" must be the target corporation in the purported reorganization and

---

[56]Respondent cites no case, and we have found none, in which a court has held <u>Alabama Asphaltic</u> to be controlling on the question of whether creditors of an insolvent corporation are to be treated as equity owners of that corporation for purposes of the continuity-of-interest requirement where the insolvent corporation (in the instant cases FSI) is not the target corporation in a purported reorganization.

(2) whether or not under that case the direct creditors of that insolvent target corporation must receive the stock of the company that acquired the stock of that target corporation or its property.  That is because, assuming arguendo that respondent were correct in respondent's view as to the appropriate and necessary two inquiries under <u>Alabama Asphaltic</u> that should be made in the instant cases, we find on the basis of the parties' agreed facts that the answer to the first of those inquiries is that the creditors of FSI did not obtain "effective command" over FSI's property.

In <u>Alabama Asphaltic</u>, "effective command" over the insolvent corporation's property arose because its creditors took steps by instituting involuntary bankruptcy proceedings against it to enforce their rights under the so-called full priority rule of <u>N. Pac. Ry. Co. v. Boyd</u>, 228 U.S. 482 (1913), "to exclude stockholders [of the insolvent corporation] entirely from the reorganization plan when the debtor is insolvent."  <u>Helvering v. Ala. Asphaltic Limestone Co.</u>, <u>supra</u> at 183-184.

Unlike the facts in <u>Alabama Asphaltic</u>, in the instant cases EJDC, Bank of Montreal, Paribas, and Campeau,[57] the creditors of FSI that pursuant to the confirmed FSI chapter 11 plan received

---

[57]We shall sometimes refer collectively to EJDC, Bank of Montreal, Paribas, and Campeau as the FSI creditors.

83.75 percent[58] of the outstanding common stock of RHC from Holdings III, did not take steps against FSI to enforce their rights under the so-called full priority rule "to exclude stock-holders [of FSI] entirely from the reorganization plan". Id. In fact, unlike the facts in Alabama Asphaltic, in the instant cases the FSI creditors did not, as respondent asserts, commence involuntary bankruptcy proceedings against FSI. Instead, FSI filed in the California U.S. Bankruptcy Court[59] a voluntary petition under chapter 11, entitled "Reorganization", of the Bankruptcy Code, 11 U.S.C. secs. 1101-1174. Unlike the facts in Alabama Asphaltic, in the instant cases FSI operated as a debtor in possession[60] at all times during the FSI chapter 11 proceedings. The FSI creditors did not object during those proceedings to FSI's acting as a debtor in possession. Nor did any of those creditors ask the Ohio U.S. Bankruptcy Court to appoint a

---

[58]See supra note 54.

[59]Hereinafter, all references to the FSI chapter 11 proceedings are to those proceedings after venue in those proceedings was transferred to the Ohio U.S. Bankruptcy Court. For convenience, we shall refer to any filing in the FSI chapter 11 proceedings with the Ohio U.S. Bankruptcy Court as FSI's filing with that court.

[60]As a debtor in possession, FSI continued to control its assets and operate its business in the same manner as it had done before the commencement of the chapter 11 proceedings. In addition, during the pendency of the FSI chapter 11 proceedings FSI continued to be managed by the officers that had managed FSI before the FSI chapter 11 proceedings had commenced.

trustee.[61]  The FSI creditors did not file with the Ohio U.S. Bankruptcy Court any proposed plan of reorganization[62] in the FSI chapter 11 proceedings.  Instead, on January 8, 1992,[63] FSI filed with the Ohio U.S. Bankruptcy Court the January 1992 proposed FSI chapter 11 plan.[64]  Although under the January 1992 proposed FSI

---

[61]The U.S. trustee program, a component of the U.S. Department of Justice that is responsible for promoting the efficiency and protecting the integrity of the Federal bankruptcy system, oversaw the FSI chapter 11 proceedings.  That program appointed an official committee of unsecured creditors in the FSI chapter 11 proceedings but did not take possession of the assets of FSI and did not have the authority to direct the disposition of that company's assets or to manage that company's business during the pendency of the FSI chapter 11 proceedings.

[62]The term "plan of reorganization" is used to refer to a plan described in chapter 11 of the Bankruptcy Code and is not intended to refer to a plan of reorganization for tax purposes. See supra note 19.

[63]FSI filed several proposed plans of reorganization with the Ohio U.S. Bankruptcy Court before filing on Jan. 8, 1992, another proposed FSI chapter 11 plan.  At no time did the FSI creditors seek to reduce the time during which FSI had the exclusive right to file a proposed plan of reorganization with the Ohio U.S. Bankruptcy Court.  Nor did those creditors object to the requests of FSI to extend the time during which it had the exclusive right to file a proposed plan of reorganization with that court.

[64]On Oct. 28, 1991, FSI filed with the Ohio U.S. Bankruptcy Court the October 1991 proposed FSI chapter 11 plan.  That plan proposed, inter alia, that the FSI creditors receive from Holdings III certain stock of Ralphs in satisfaction of their creditor claims against FSI.  Respondent focuses on that proposed plan in further support of respondent's assertion that the "creditors of FSI took overt steps to exert their control over its assets."  Respondent contends:

> The [Ralphs] transaction here was undertaken at
> the very end of the bankruptcy proceedings when the
>                                        (continued...)

chapter 11 plan the claims of secured creditors of FSI except class 11[65] were impaired and certain unsecured creditors of FSI were to receive property with respect to their claims, none of the FSI creditors objected to or rejected that proposed plan. In fact, those creditors accepted in writing the January 1992 proposed FSI chapter 11 plan, and the Ohio U.S. Bankruptcy Court confirmed it on January 10, 1992.

On the parties' agreed facts, we find that under <u>Alabama Asphaltic</u> the FSI creditors did not take "effective command" over

---

[64](...continued)
creditors' inchoate rights had matured into effective control of the property. The initial plan had been for the * * * [Ralphs] stock to go directly to the creditors. However, after the creditors were already entitled to receive the * * * [Ralphs] stock, the creditors directed that the * * * [Ralphs] stock, rather than going to the creditors themselves, should go to the acquiring corporation (the creditor's wholly-owned holding company) [RHC]. In directing the * * * [Ralphs] stock to the acquiring corporation, the creditors controlled where the Ralphs stock went.

The above-quoted contentions of respondent are refuted by the facts to which the parties agreed for purposes of their respective motions for partial summary judgment. The FSI creditors were not entitled to any property of FSI or Holdings III before the Ohio U.S. Bankruptcy Court confirmed the January 1992 proposed FSI chapter 11 plan. That confirmed plan required, inter alia, that EJDC, Bank of Montreal, Paribas, and Campeau receive certain stock of RHC, and not stock of Ralphs, in satisfaction of their respective creditor claims against FSI. The October 1991 proposed FSI chapter 11 plan on which respondent focuses was never confirmed by the Ohio U.S. Bankruptcy Court and did not entitle the FSI creditors to any stock of Ralphs.

[65]See <u>supra</u> note 26.

the assets of FSI.[66]  We conclude that <u>Alabama Asphaltic</u> is
materially distinguishable from the instant cases, that
respondent's reliance on that case is misplaced, and that that
case is not controlling in the instant cases.

We also find the <u>Alabama Asphaltic</u> progeny to be materially
distinguishable from the instant cases.  In the <u>Alabama Asphaltic</u>
progeny, the courts concluded, as did the Supreme Court in
<u>Alabama Asphaltic</u>, that the determinative fact was whether the
creditors of the insolvent corporation took proactive steps and
thereby obtained effective command over the insolvent
corporation's property.  See, e.g., <u>Palm Springs Holding Corp. v.
Commissioner</u>, 315 U.S. 185, 188-189 (1942); <u>Wells Fargo Bank &
Union Trust Co. v. United States</u>, 225 F.2d 298, 300-301 (9th Cir.
1955).  Unlike the creditors involved in the instant cases, the
creditors involved in the <u>Alabama Asphaltic</u> progeny took
proactive steps to enforce or protect their rights in the
insolvent corporations' properties, such as filing a foreclosure
action under mortgages securing the insolvent corporation's

[66]Assuming arguendo that Holdings III, which the parties
agree would be the target corporation in a reorganization
qualifying under sec. 368(a)(1)(C) or (G), were insolvent and
that it were correct under <u>Alabama Asphaltic</u> to determine whether
the FSI creditors had "effective command" over the property of
Holdings III, we would find for the reasons discussed above as to
why the FSI creditors did not have "effective command" over FSI's
property that the FSI creditors did not have such "effective
command" over the property of Holdings III.

debt,[67] selling the insolvent corporation's assets under an
indenture,[68] filing a receivership action against the insolvent
corporation,[69] or entering into possession and operating the
property of the insolvent corporation.[70]  In the instant cases,
none of the FSI creditors took any proactive steps to enforce or
protect their respective rights to payment by FSI of their
respective debts.

Based upon the parties' agreed facts, we reject respondent's
argument that, in determining whether the continuity-of-interest
requirement is satisfied in the Ralphs transaction, Alabama
Asphaltic requires us to treat as equity owners of FSI the FSI
creditors who received 83.75 percent[71] of the outstanding common
stock of RHC.  Respondent does not cite, and we have not found,
any case in which a court has held Alabama Asphaltic to be
controlling under facts materially indistinguishable from the

---

[67]See, e.g., Wells Fargo Bank & Union Trust Co. v. United
States, 225 F.2d 298, 300 (9th Cir. 1955); Peabody Hotel Co. v.
Commissioner, 7 T.C. 600, 602-603 (1946); Pearson Hotel, Inc. v.
Commissioner, 199 F. Supp. 33, 35 (N.D. Ill. 1959).

[68]See, e.g., Palm Springs Holding Corp. v. Commissioner, 315
U.S. 185, 186 (1942).

[69]See, e.g., Atlas Oil & Ref. Corp. v. Commissioner, 36 T.C.
675, 676 (1961); Ky. Natural Gas Corp. v. Commissioner, 47 B.T.A.
330, 333 (1942).

[70]See, e.g., Roosevelt Hotel Co. v. Commissioner, 13 T.C.
399, 401 (1949).

[71]See supra note 54.

parties' agreed facts in the instant cases.  Nor has respondent offered any persuasive reason why we should extend the holding of Alabama Asphaltic to the parties' agreed facts.

We hold that the continuity-of-interest requirement is not satisfied in the Ralphs transaction and that that transaction is not a reorganization under section 368(a)(1)(B), (C), or (G).[72] Respondent does not dispute that if we were to hold, which we have, that the Ralphs transaction is not a reorganization under any of those provisions of section 368, (1) RHC's acquisition of the outstanding common stock of Ralphs from Holdings III and Allied would constitute a purchase under section 338(h)(3) and a qualified stock purchase under section 338(d)(3), and (2) RHC and FSI would have made a valid joint election under section 338(h)(10) with respect to that acquisition.

We have considered all of the contentions and arguments of the parties that are not discussed herein with respect to the matters that we address herein, and we find them to be without merit, irrelevant, and/or moot.

---

[72]In the light of our holdings that the Ralph's transaction does not satisfy the continuity-of-interest requirement and is not a reorganization under sec. 368(a)(1)(B), (C), or (G), we need not and shall not address whether the Ralphs transaction satisfies, as respondent maintains and petitioners dispute, the other requirements applicable to each of the three types of reorganizations on which respondent relies.

To reflect the foregoing,

<u>An order granting petitioners' motion and denying respondent's motion will be issued</u>.

APPENDIX



Subsidiaries, including:

Allied Credit Holdings
Allied Real Estate Subs.
Jordan Marsh Stores Corp.
Maas, Inc.
Stern's, Inc.
The Bon, Inc.

Subsidiaries, including:

Bloomingdales, Inc.
Bloomingdales By Mail
Burdine's, Inc.
Federated Credit Holdings
Federated Real Estate
Rich's, Inc.